[Nos. 52649–4, 52884–5, 52937–0. En Banc. April 30, 1987.]

THE BOEING COMPANY, *Appellant,* v. SIERRACIN
CORPORATION, ET AL, *Respondents.*

*Perkins Coie,* by *Thomas L. Boeder, M. Margaret Mc-Keown,* and *Heidi L. Sachs,* for appellant.

*Culp, Dwyer, Guterson & Grader,* by *Diane G. Fitz-Gerald* and *Jerry R. McNaul,* for respondents Sierracin Corp., et al.

*Graham & Dunn,* by *James L. Magee* and *Wendy D. Welkom,* for respondent Libbey–Owens–Ford Co.

DORE, J.—This appeal stems from a 2–month trial between the Boeing Company and Sierracin Corporation. Boeing alleged that Sierracin misappropriated its trade secrets concerning the design of airplane windows. Sierracin counterclaimed asserting that Boeing's actions to protect its designs violated Washington antitrust laws. A jury found for Boeing on its trade secrets claim and for Sierracin on its antitrust counterclaim. Both sides appeal.

We affirm Boeing's judgment on its trade secrets claim

for $3,270,666, and we affirm the award of attorney fees to Boeing for $353,565.45. We set aside Sierracin's judgment on its antitrust counterclaim in its entirety and we reverse the award for attorney fees and costs to Sierracin. We uphold the trial court's dismissal of the third party defendants. Finally, we remand this case to the trial court to determine an award of reasonable attorney fees for Boeing on appeal.

FACTS

This lawsuit concerns the manufacture and marketing of replacement cockpit windows for Boeing 707's, 727's and 737's, known as Triple Seven (7/7/7) windows. Five of these windows lie on each side of the aircraft's nose, each performing multiple critical functions such as defogging, withstanding cabin pressurization, and providing a clear range of vision. Historically, only the appellant Boeing Company held the necessary Federal Aviation Administration Parts Manufacturer Authorization (hereinafter authorization), so only Boeing or its licensee could legally sell those windows.

Boeing's drawings for the 7/7/7 cockpit windows are unique, detailed blueprints containing approximately 500 critical tolerances, dimensions, specifications and material requirements. The basic design, which played an integral role in the production of the world's first commercial jet transport, has undergone minor changes since its inception in the 1950's, each requiring FAA reauthorization.

Because these drawings are the result of Boeing's original $16 million investment, and as they constitute Boeing's "lifeblood" in the commercial airplane business, Boeing always considered them proprietary trade secrets. For protection of its trade secrets Boeing requires in a standard contract provision that Boeing's outside suppliers, who receive these drawings, agree not to use them for any purpose other than exclusive Boeing manufacture.

Prior FAA authorization is needed for every spare part sold or installed on any commercial aircraft. Outside suppliers may manufacture and sell airplane parts by either: (1) selling to a manufacturer with prior FAA design

authorization (like Boeing); or (2) selling directly to airlines after obtaining their own FAA authorization by (a) independent design and testing; (b) licensing from another authorized airplane manufacturer (like Boeing); or (c) showing that their own drawings and manufacturing processes are identical to those previously authorized (identicality). In granting an identicality, the FAA does not consider where the applicant obtained its drawings or derived its manufacturing process.

The three major suppliers of aircraft windows in the United States are PPG Industries, Inc.; Swedlow, Inc.; and Sierracin.[1] Sierracin had supplied Boeing with other products for many years. In 1982, it began manufacturing Boeing's 7/7/7 windows after acquiring the business of Libbey–Owens–Ford Company, which had previously been a supplier of those windows. Boeing helped Sierracin enter the 7/7/7 window market by providing Sierracin with FAA authorized drawings, technical assistance and tooling, and by awarding it contracts for some of Boeing's 7/7/7 window needs in 1982 and 1983.

As a supplier, Sierracin received Boeing requests for quotations, which provided that all orders were subject to its confidential terms and conditions. Sierracin signed more than 270 Boeing contracts containing the same terms and conditions without objection, and signed and accepted Boeing purchase orders with a similar provision. Sierracin accepted Boeing's terms by letter, and after performance accepted payment under the purchase orders.

In 1984 after alleged breaches of contract because of late deliveries of windows, Boeing chose not to renew contracts with Sierracin, and instead signed a 5–year 100 percent requirements contract with PPG Industries, Inc. Sierracin decided, however, to continue manufacturing windows for

---

[1]Respondents/cross appellants Sierracin Corporation and Sierracin Glass Transparencies, Inc., are referred to collectively as Sierracin. Sierracin Glass Transparencies, Inc. (SGT), is a joint venture of Sierracin Corporation and Asahi Corporation of Japan. SGT has no employees or manufacturing facilities of its own and relies on Sierracin Corporation to manufacture the 7/7/7 windows.

sale on its own in the 7/7/7 "after market" (*i.e.,* spare parts market). A Boeing official warned Sierracin against use of Boeing proprietary data for any purpose other than manufacturing parts for Boeing. Sierracin ignored the warning and used various Boeing engineering drawings and specifications to try to obtain its own authorization from the FAA. The FAA asked Boeing to make an identicality comparison between Boeing's 7/7/7 windows and those manufactured by Sierracin. Boeing refused and accused Sierracin of copying its drawings. Sierracin denied these accusations and Boeing filed this suit.

Sierracin then submitted a second set of drawings to the FAA, but those drawings were derived from the first authorization drawings which had been copied from Boeing drawings. There was conflicting testimony as to whether Sierracin could "reverse engineer" the Boeing drawings on its own. Reverse engineering is the process of recreating the product and the drawing depicting it by use of the product itself. Sierracin claimed it would have taken only a few weeks to a few months to reverse engineer the window, while Boeing engineers testified that it would have been virtually impossible. Sierracin's subsequent efforts to re–verse engineer one window were rejected by the FAA.

### Trial and Appeal

Boeing's lawsuit against Sierracin alleged breach of contract, breach of confidential relationship, conversion and misappropriation of trade secrets in violation of the Uniform Trade Secrets Act, RCW 19.108. Boeing also alleged that Sierracin wrongfully copied certain tooling used by Boeing and the United States Air Force (Air Force). The trial court dismissed this claim, ruling that the Air Force was an indispensable party.

Sierracin asserted an antitrust affirmative defense and six counterclaims. Its counterclaim alleging "sham litigation" was dismissed by the trial court. The remaining counterclaims alleged that Boeing had violated the antitrust provisions of the Consumer Protection Act, RCW

19.86, by (1) engaging in an unlawful tying arrangement; (2) entering into a contract or combination which unreasonably restrains trade; (3) attempting to monopolize the relevant market; (4) monopolizing the relevant market; and (5) engaging in unfair trade practices or unfair methods of competition. Sierracin filed a third party complaint against Libbey, alleging that when Sierracin purchased detailed information from Libbey about 7/7/7 windows, Libbey warranted that that information would not violate any contract or agreement between Libbey and third parties such as Boeing. The trial court dismissed this breach of warranty claim on a directed verdict.

The jury awarded Boeing $1,635,333 in damages against Sierracin, and Sierracin $1,062,442 in damages against Boeing. The trial court found Sierracin's misappropriation of Boeing trade secrets to be willful and malicious within the meaning of RCW 19.108.030(2), and awarded exemplary damages which doubled Boeing's award. The trial court also doubled Sierracin's antitrust damages against Boeing. Next, the court awarded fees and costs to Sierracin under RCW 19.86.090 and to Boeing under RCW 19.108.040. The trial court then entered a permanent injunction against Sierracin's use of the FAA authorization obtained using Boeing data. The trial court delayed the effective date of its injunction for 120 days.

The Court of Appeals in *Boeing Co. v. Sierracin Corp.*, 43 Wn. App. 288, 716 P.2d 956 (1986) stayed the injunction beyond the original 120 days pursuant to RAP 8.3. Although Boeing's motion for discretionary review was denied, we accepted transfer of the entire case. On remand, the trial court in lieu of dissolving the stay on the injunction ordered Sierracin to make periodic escrow payments of 5 percent of Boeing's sales price for each 7/7/7 cockpit window sold pending appeal, and to post a $50,000 bond covering Boeing's costs and attorney fees on appeal. Boeing's motions for direct review and consolidation were granted.

At this juncture, we believe it would be helpful to set forth verbatim the jury verdict.

VERDICT FORM

BOEING CLAIMS

QUESTION 1: Did Sierracin breach a confidential relationship with Boeing?

(Yes) 10　　　No 2

QUESTION 2: Did Sierracin breach a contract with Boeing?

(Yes) 11　　　No 1

QUESTION 3: Did Sierracin misappropriate Boeing trade secrets?

(Yes) 11　　　No 1

QUESTION 4: If your answer to any of the foreg[o]ing questions is "yes", do you find that Boeing has been damaged by any of Sierracin's actions?

(Yes) 12　　　No 0

If your answer is "yes", what do you find to be the amount of damages?

$1,635,333.00

SIERRACIN CLAIMS

QUESTION 1: Has Boeing engaged in an unlawful tying arrangement?

Yes 2　　　No 10

QUESTION 2: Has Boeing entered into any contract or combination which unreasonably restrains trade?

Yes 11　　　No 1

QUESTION 3: Has Boeing attempted to monopolize the relevant market?

Yes 12　　　No 0

QUESTION 4: Has Boeing monopolized the relevant market?

Yes 2 No 10

QUESTION 5: Has Boeing engaged in unfair trade practices or unfair methods of competition?

Yes 2 No 10

QUESTION 6: If your answer to any of Questions 1 – 5 above is "yes", do you find that Sierracin has been damaged as a proximate cause of such conduct?

Yes 12 No __

QUESTION 7: If your answer to Question 6 is "yes," what do you find to be the amount of damages? $1,062,442

/s/ Richard W. Holt
FOREPERSON

## TRADE SECRETS

The Uniform Trade Secrets Act, RCW 19.108.030(1), provides that a plaintiff can receive actual damages for misappropriation of trade secrets. RCW 19.108.010(2)(a) defines "misappropriation" as "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . ." Ample evidence was presented to the jury which indicated that Sierracin's actions in using the Boeing drawings to manufacture 7/7/7 windows for direct sales to other airlines, as well as to gain independent FAA authorization, violated this statute. Moreover, the jury also found that Sierracin breached its contract with Boeing and breached the confidential relationship between the two parties. As substantial evidence exists which supports all three of these claims, we affirm the jury verdicts. *Thompson v. Grays Harbor Comm'ty Hosp.*, 36 Wn. App. 300, 675 P.2d 239 (1983).

Sierracin signed over 270 contracts with Boeing, each containing the following proprietary language:

> Confidential Disclosure. Seller shall keep confidential . . . all proprietary information including, but not limited to, designs, processes, *drawings,* specifications, reports, data, and other technical or business information and the features of all parts, equipment, tools, gauges, patterns, and other items furnished or disclosed to Seller by Buyer. . . . Seller shall use such information and items, and the features thereof, only in the performance of this Order; . . .

(Italics ours.) Exhibit 1503.

Similar proprietary language was affixed to Boeing drawings which Sierracin received:

> Boeing Proprietary. The information contained herein is *proprietary to The Boeing Company* and shall not be reproduced or disclosed in whole or in part or used for any design or manufacture except when such user possesses direct, written authorization from *The Boeing Company.*

Exhibit 176.

Despite this contractual language and warnings on the drawings indicating that this information was confidential, Sierracin asserts that the jury erred in finding for Boeing on its breach of contract, breach of confidential relationship, and misappropriation of trade secrets claims. Sierracin raises the following arguments in support of its assertion: (1) Boeing's claims should have been consolidated; (2) Boeing's trade secrets claim is preempted by federal law; (3) even if not preempted, Boeing had no "secrets" because the "secrets" were ascertainable from common tooling; and (4) if Boeing did have "secrets", they were lost into the public domain upon submission to the FAA at time of licensure, or were otherwise "published" through confidential disclosure of drawings to Libbey, and by use of exhibits at trial. All these arguments lack merit.

### 1. Consolidation of Claims

The jury found that Sierracin had breached a contractual and confidential relationship with Boeing, and had misap-

propriated Boeing trade secrets. Sierracin argues that the trial court erred by not consolidating all of these claims into one for misappropriation under the Uniform Trade Secrets Act, RCW 19.108.

■ We reject this argument. RCW 19.108.900 specifically provides, in part:

(1) This chapter displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret.
(2) This chapter does not affect:
(a) Contractual or other civil liability or relief that is not based upon misappropriation of a trade secret . . .

*See also* Proceedings in Committee of the Whole, Uniform Trade Secrets Act of the National Conference of Commissioners on Uniform State Laws, at 6 (Aug. 3, 1978). The act merely displaces conflicting tort, restitutionary and other law regarding civil liability for misappropriation.

The United States Supreme Court has held that proof of trade secrets is not required for breach of confidentiality claims, which may be brought independently of trade secrets claims. *E.I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 102, 61 L. Ed. 1016, 37 S. Ct. 575 (1917); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 293 (9th Cir. 1969). A confidential relationship alone is enough to prohibit disclosure. *Island Air, Inc. v. LaBar*, 18 Wn. App. 129, 138–39, 566 P.2d 972 (1977). Furthermore, a contractual provision designed to protect against disclosure would also not be subject to displacement by the Uniform Trade Secrets Act. RCW 19.108.900(2)(a). The Committee specifically dealt with this question and decided as follows:

(1) Should the Act cover contract liability as well as tort liability? The answer then was: No. It is the judgement of the Committee that the answer still should be no, and that the Act limit itself to the tort situation.

Report of Proceedings, at 6.

The trial court did not err in refusing to consolidate Boeing's claims.

## 2. Federal Preemption

Sierracin argues that federal law preempts Boeing's claims and that Washington law is inapplicable. This assertion is properly before us, as subject matter jurisdiction may be raised at any time. *Ullom v. Renton*, 5 Wn.2d 319, 322, 105 P.2d 69 (1940). While it is true that all state legal and equitable rights equivalent to copyright are preempted by federal law, we do not believe that federal copyright law preempts state trade secrets claims.

 State law extends protection beyond copyright. Copyright does not protect an idea itself, only its particular expression. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977). By contrast, trade secrets law protects the author's very ideas if they possess some novelty and are undisclosed or disclosed only on the basis of confidentiality.[2] *Warrington Assocs. v. Real-Time Eng'g Sys.*, 522 F. Supp. 367, 368 (N.D. Ill. 1981). It is not just "drawings" which Boeing seeks to protect, but the information contained thereon, without which it is impossible to manufacture 7/7/7 windows. Until Sierracin is able to reverse engineer the windows, that information possesses some novelty as yet disclosed only on the basis of confidentiality. *Warrington.* Hence the information should be characterized as trade secrets, and state law applies.

## 3. Boeing's "Secrets"

A plaintiff seeking to establish a trade secrets claim under the uniform act has the burden of proving that legally protectable secrets exist. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 898 (Minn. 1983). For trade secrets to exist, they must not be "readily ascer-

---

[2]RCW 19.108.010(4) defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that:

"(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

"(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

50

tainable by proper means" from some other source, including the product itself. RCW 19.108.010(4)(a). *See also, e.g., Chicago Lock Co. v. Fanberg,* 676 F.2d 400, 404 (9th Cir. 1982).

■ Sierracin argues that Boeing could not establish that its 7/7/7 drawings and data were secrets, and that the trial court erred in excluding certain evidence regarding "common tooling" and reverse engineering. Sierracin points to the fact that the tooling needed to produce 7/7/7 windows and the tooling the Air Force used to make KC 135 military planes were in some respects identical. Because the data and design of the windows could be to some extent ascertained from this "common tooling", Sierracin asserts that the design of the 7/7/7 was in the public domain, and that the trial court erred in excluding evidence that the "secret drawings" could be obtained from the common tooling. We disagree. We note that the common tooling did not provide all the information necessary to construct a 7/7/7 window. By its very nature, the common tooling did not contain the complete and detailed specifications and tolerances necessary for FAA authorized commercial 7/7/7 window engineering drawings.

A trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere. *Hayes–Albion Corp. v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609 (1984). Such a burden would be insurmountable since trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets. *See Servo Corp. of Am. v. General Elec. Co.,* 393 F.2d 551 (4th Cir. 1968). Sierracin's argument that certain information contained in the drawings could be derived from common tooling, which the Air Force possessed, is therefore without merit. Hence the court did not err by excluding Sierracin's testimony that Boeing's "secrets" in the drawings could be derived from common tooling.

The court also did not err by excluding the testimony of Sierracin's engineer, who purported to have disassembled a

7/7/7 window, taken measurements and prepared a drawing. The record indicates that: (1) the engineer had almost no experience with reverse engineering of the type needed; (2) Sierracin failed to report reverse engineering efforts until long after discovery cutoff, several weeks into trial and more than a month after Boeing had deposed the engineer, although Boeing had requested information about reverse engineering in interrogatories and other discovery requests; (3) Sierracin's attempts were only hypothetical as to whether an FAA authorized drawing would result; and (4) the trial court thought it too easy to merely announce the simplicity of reverse engineering without a solid basis. Admission of testimony is discretionary with the trial court. *Harrison v. Whitt,* 40 Wn. App. 175, 698 P.2d 87, *review denied,* 104 Wn.2d 1009 (1985). There was no abuse of discretion here.

In passing, we also note that Boeing has appealed the trial court's dismissal of its claim against Sierracin for conversion of the common tooling to develop a fixture needed to construct 7/7/7 windows. The court dismissed Boeing's claim, believing the Air Force to be an indispensable party under CR 19 because it gave the common tooling to Sierracin in possible breach of its obligations to Boeing.

The doctrine of indispensability of parties is founded on basic equitable considerations. *Cathcart–Maltby–Clearview Comm'ty Coun. v. Snohomish Cy.,* 96 Wn.2d 201, 206, 634 P.2d 853 (1981). The court must determine whether in equity and good conscience the action should proceed or be dismissed. *In re Johns–Manville Corp.,* 99 Wn.2d 193, 660 P.2d 271 (1983). CR 19(b) directs the court to consider the extent to which an absent party may be prejudiced and whether the plaintiffs will have an adequate remedy if the action is dismissed.

We find that the trial court correctly ruled that the Air Force was an indispensable party to the common tooling claim.

### 4. Loss of Secrets in the Public Domain

Sierracin further argues that if Boeing had secrets, they were lost by passage into the public domain upon submission of drawings to the FAA at time of licensure, through confidential disclosure of drawings to Libbey, or by use of exhibits at trial. We disagree.

(a) <u>Engineering drawings are prima facie trade secrets.</u> If Boeing automatically lost trade secrets upon submission to the FAA, it could never have them, because FAA submission is required before manufacture of a single airplane. Submission of confidential data to the FAA does not mean that the information is available to the public upon demand. On the contrary, such information is exempt from public disclosure because it could substantially harm the competitive position of the entity which was required to submit the information. *Air Line Pilots Ass'n, Int'l v. FAA,* 552 F. Supp. 811, 814 (D.D.C. 1982).

(b) <u>No loss of secrets by confidential transmission at time of sale.</u> Boeing did not lose its secrets through confidential disclosure of drawings to Libbey. The secrets were preserved by first Libbey's and then Sierracin's promise to keep the information confidential. Upon transmission of Boeing drawings to Sierracin at the time of the Libbey sale, the contract between Sierracin and Libbey provided that the practice of Libbey's "Know–how" by Sierracin would not violate any contract or agreement between Libbey and third parties. "Know–how" was defined to include "parts lists, layouts, assembly and detail drawings, specifications, procurement data, design data and engineering data . . ." Exhibit 1013, ¶ 1.3. The contract also provided that "Sierracin will not knowingly disclose to others the Know–How communicated to it by LOF either prior to or after the date of this agreement", and "Sierracin shall use every effort to ensure that no unauthorized disclosure by its employees, agent, contractors, or affiliates occurs." Exhibit 1013, ¶ 2.5(b) and ¶ 2.5(b) (iv) (C).

Boeing claimed the misappropriation of only the *updated* drawings in Sierracin's possession. Sierracin's own engineer

said he routinely threw away all previous title block drawings when he received Boeing updates. The Libbey drawings were not those upon which Boeing claimed secrets in this lawsuit, since they were not the current FAA authorized drawings needed to manufacture the windows.

(c) Open trial. Finally, Boeing did not lose its trade secrets through publication of exhibits at trial. Prior to trial Boeing moved to exclude the general public from the courtroom during presentation of certain testimony and evidence. Sierracin vigorously opposed Boeing's motion, remarking that any courtroom visitors would not likely be able to review the evidence. Sierracin's argument comes too late. The parties had specifically stipulated to protect confidential data at trial, and the trial court was mindful of this when denying Sierracin's motion to terminate the injunction.

Furthermore, the trial court was justified in sealing the record. RCW 19.108.050 allows for this procedure as it is obvious that otherwise trade secrets holders would be prevented from defending their rights in court. The same reasoning applies to use of exhibits at trial. As a trade secrets holder who in good faith sought legal remedy to protect its rights, Boeing did not thereby "publish" and lose its secrets at trial.

### 5. Antitrust Affirmative Defense

As its final attack on Boeing's jury verdict, Sierracin argues that its antitrust counterclaim constitutes an affirmative defense to Boeing's claims. We reject this argument, as we find no antitrust violation. See discussion, *infra.*

Furthermore, Sierracin's antitrust defense to the breach of contract claim is valid only if enforcement of the contracts would itself require unlawful conduct. *Kelly v. Kosuga,* 358 U.S. 516, 3 L. Ed. 2d 475, 79 S. Ct. 429 (1959); *El Salto, S.A. v. PSG Co.,* 444 F.2d 477, 482 (9th Cir. 1971). The confidentiality clauses in the Boeing/Sierracin contracts do not compel violation of antitrust laws or any other statute, nor do they restrict Sierracin from lawfully com-

peting with Boeing by obtaining its own authorization through an original design, reverse engineering, or information from the public domain. Instead they protect what the jury found were Boeing's legitimate trade secrets.

### ANTITRUST COUNTERCLAIM

Sierracin's antitrust counterclaims were brought under Washington's Consumer Protection Act, RCW 19.86 (hereinafter the Act). Under the law unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce; every contract, combination or conspiracy in restraint of trade or commerce; and monopolization, or attempt to monopolize any part of trade or commerce are unlawful. RCW 19.86.020–.040. Private parties injured by violations of the Act may bring actions under RCW 19.86.090, which allows actual damages including costs and attorney's fees as well as discretionary treble damages.

The Legislature intended the Act to complement federal antitrust laws and, in construing the Act, we are guided by federal decisions dealing with the same or similar matters. RCW 19.86.920. In applying the Act to the facts here, we must follow two broad guidelines: (1) it shall be liberally construed so that its beneficial purposes may be served, and (2) it shall not prohibit acts or practices which are reasonable in relation to the development and preservation of business, or which are not injurious to the public interest. RCW 19.86.920. The latter consideration requires courts to "weigh the public interest in prohibiting anticompetitive conduct against the recognition that businesses need some latitude within which to conduct their trade." *State v. Black,* 100 Wn.2d 793, 803, 676 P.2d 963 (1984). Where conduct is motivated by legitimate business concerns, there can be no violation of RCW 19.86. *Black,* at 802–03.

The jury answered in its special verdict that Boeing entered into some contract or combination which unreasonably restrained trade, and that Boeing attempted to monopolize the relevant market, causing Sierracin damages

in the amount of $1,062,442. Boeing argues that these findings are inconsistent with the jury finding that Boeing sustained damages from Sierracin's wrongful misappropriation of Boeing's trade secrets, and that the jury's antitrust answers favoring Sierracin on its counterclaims are not supported by substantial evidence.

### 1. Contract or Combination in Restraint of Trade

■ An illegal combination in restraint of trade requires two factors to be present: (1) two or more actors, and (2) concerted action. 16A J. von Kalinowski, *Business Organizations, Antitrust Laws and Trade Regulation* § 6.01[1] (1986). Sierracin failed to show that Boeing engaged in any concerted action with any other person to violate any antitrust laws. Sierracin's assertions that Boeing's contacts with the FAA, Boeing's requirements contract with PPG, the confidentiality clauses of Boeing's supplier contracts and Boeing's customer support agreements are combinations or contracts in restraint of trade are not supported by substantial evidence.

(a) <u>FAA contacts.</u> Boeing's contacts with the FAA in 1976 and 1984 do not constitute an illegal combination in restraint of trade. In 1976 Boeing formed an internal committee to prevent lost revenue from unauthorized spare parts "after market" sales. Pursuant to the committee's recommendation, Boeing arranged with the FAA to have the FAA's Western Region Office informally advise Boeing when a manufacturer sought an identicality authorization using Boeing drawings. The FAA contacted Boeing in 1984 when Sierracin submitted identicality drawings for authorization.

Sierracin does not allege that the FAA, in contacting Boeing, had the purpose of restraining competition. Its clear purpose was to obtain Boeing's help in making an identicality determination. This, combined with the fact that Boeing refused to assist the FAA in that matter demonstrates that there was no concerted action with the FAA for a common end of restraint of trade.

 Furthermore, Boeing's communications with a government agency are generally immune from antitrust liability under the first amendment to the United States Constitution. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 30 L. Ed. 2d 542, 92 S. Ct. 609 (1972). Only where the contacts are a mere sham, taken only to interfere with free competition and without reason to expect resulting lawful governmental action, is this immunity lost. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); *Omni Resource Dev. Corp. v. Conoco, Inc.,* 739 F.2d 1412 (9th Cir. 1984).

Here, Sierracin failed to present any evidence that the contacts between Boeing and the FAA were a sham or to offer evidence to rebut Boeing's claim that it made the contacts to promote its legitimate business purposes in protecting its trade secrets.

 (b) PPG requirements contract. The Boeing/PPG 5–year requirements contract is likewise not a contract or combination in restraint of trade. Requirements contracts are not per se antitrust violations since they may involve motives other than preventing competition and may actually encourage competition, benefiting all involved. *See, e.g., Standard Oil Co. v. United States,* 337 U.S. 293, 306–07, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949).

Contracts entered for legitimate business purposes do not violate the Act. *State v. Black,* 100 Wn.2d at 802–03. The record indicates that Boeing found Sierracin had quality problems and did not deliver on schedule under its previous contract to supply a portion of Boeing's needs. Boeing's unrebutted evidence shows that it entered into the requirements contract to stabilize its costs and obtain an assured supply of the 7/7/7 cockpit windows without having to depend on what it considered an unreliable supplier.

(c) Confidentiality clauses and proprietary rights legends. Sierracin argues that the confidentiality clauses in its contracts with Boeing and the proprietary rights legends Boeing put on its engineering drawings constitute combinations

or contracts in restraint of trade.[3]

Boeing's confidentiality clauses and proprietary legends protect what the jury found were legitimate trade secrets. A limited confidentiality agreement that does not generally restrain trade is not illegal per se. *Island Air, Inc. v. LaBar,* 18 Wn. App. 129, 138–39, 566 P.2d 972 (1977). In the absence of Washington cases discussing when assertion of trade secrets constitutes a violation of antitrust laws, we are guided by interpretations of the federal courts. RCW 19.86.920.

■ In *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842 (1st Cir. 1985), *cert. denied,* 475 U.S. 1016 (1986) plaintiffs had learned techniques for manufacturing zinc compounds for military application while in defendant's employ. Defendant required plaintiffs to sign an agreement that they would pay royalties for their production of those compounds after they started their own company, despite the fact that the technology had entered the public domain. *Raytheon,* at 847–54. The court, in upholding the jury's verdict of antitrust damages, enunciated the following standards which should be applied when a party claims that assertion of trade secrets constitutes a violation of antitrust laws:

> [T]he proper balance between the antitrust laws and trade secrets law is achieved by requiring an antitrust plaintiff to prove, in addition to the other elements of an antitrust violation, by clear and convincing evidence, that the defendant asserted trade secrets with the knowledge that no trade secrets existed.

*Raytheon,* at 851. *See also A. & E. Plastik Pak Co. v. Monsanto Co.,* 396 F.2d 710 (9th Cir. 1968) (agreement

---

[3]We find Sierracin's argument ironic, as Sierracin now uses on its own behalf a confidentiality clause which is substantially the same as Boeing's. It provides:

CONFIDENTIAL TREATMENT OF INFORMATION

21.1 Distributor agrees to keep confidential all information obtained from Sierracin with respect to proprietary items, trade secrets, processes, inventions, prices, operating procedures and such other material as supplied by Sierracin.

Exhibit 54.

purporting to license trade secrets, which is in reality a mere sham to restrict competition, may violate antitrust laws). Thus, good faith is a defense to a claim of antitrust violation based on assertion of trade secrets.

Sierracin argues that we should apply a line of patent law cases here. *E.g., Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir. 1979), *cert. denied,* 444 U.S. 1025 (1980). However, the court in *Raytheon* noted important differences between the competitive impact of federal patent monopolies and trade secrets, despite the fact that both are intended to encourage and reward invention. A patent conveys the right to exclude all competitors for 17 years, regardless of independent invention. The cornerstone of trade secrets, on the other hand, is secrecy; and once trade secrets enter the public domain, the possessor's exclusive rights to the secrets are lost. *Raytheon,* at 850. Thus, an element of trade secrets law is to maintain and promote standards of commercial ethics and fair dealing in protecting those secrets. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481–82, 40 L. Ed. 2d 315, 94 S. Ct. 1879 (1974).

Following the analysis of *Raytheon* and *A. & E. Plastik,* we find that Boeing's contract clauses and actions taken in good faith to protect its trade secrets cannot be a violation of antitrust laws. Boeing knew its trade secrets were legitimate, and its protection of those secrets could not have been a sham. The jury, by their judgment for Boeing, found Boeing acted in good faith.

(d) Tying. Sierracin argued at trial that Boeing had entered into tying agreements with airline customers to cut off non–Boeing suppliers in the spares "after market." Tying is generally considered a per se violation of antitrust law once requisite market power is established. *Jefferson Parish Hosp. Dist. 2 v. Hyde,* 466 U.S. 2, 9–10, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984); *Ballo v. James S. Black Co.,* 39 Wn. App. 21, 26, 692 P.2d 182 (1984).

Boeing's spare parts agreement with its airline customers provides that in exchange for Boeing's obligation to support its airplanes so long as they are flying, the customers will

buy "Boeing spare parts" from Boeing. In 1983, Boeing advised its customers they could purchase spare parts from any FAA authorized supplier; hence Sierracin knew that it was not precluded from getting its own authorization for "after market" sales. Accordingly, the jury rejected Sierracin's "unlawful tying" argument.

The finding that there was no unlawful tying, combined with the fact that any possible attempt at tying occurred before Sierracin entered the picture preclude our finding any contract or combination in restraint of trade on these grounds.

## 2. Attempt To Monopolize

■ No Washington case has defined the elements of an illegal "attempt to monopolize" under RCW 19.86.040. Under federal case law a claimant must establish: (1) specific intent to monopolize; (2) predatory or anticompetitive conduct directed to accomplishing an unlawful purpose; and (3) causal antitrust injury. *Syufy Enters. v. American Multicinema, Inc.*, 783 F.2d 878, 886–87 (9th Cir. 1986). Boeing urges this court to adopt the additional element of "dangerous probability of success." We find it unnecessary to adopt this additional element because it may be inferred from specific intent and monopoly power. *See Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474–75 (9th Cir.), *cert. denied,* 377 U.S. 993 (1964). In the subject case, adoption of the additional element would make no difference, because the jury found that Sierracin did not establish predatory or anticompetitive conduct, or causal antitrust injury and damages. See section 3, *infra.*

Each of Sierracin's assertions of acts on Boeing's part that it argues constitute attempt to monopolize fails, either because of lack of substantial supporting evidence or because the jury's finding of legitimate trade secrets bars recovery.

(a) FAA contacts and contracts. Sierracin's claims of attempted monopoly based on the FAA contacts, the PPG requirements contract, the confidentiality clauses and the spare parts agreements fail for the same reasons they can-

not form the basis of a claim of unlawful contract or combination in restraint of trade. As previously discussed, Boeing's contacts with the FAA are privileged; the contacts do not constitute a "sham", as Boeing had proprietary rights in protecting its trade secrets. Boeing also had valid business reasons for entering into the contracts, and so they cannot form the basis of a claim under RCW 19.86. *See State v. Black,* 100 Wn.2d at 802–03.

(b) Air Force dispute. Evidence of Boeing's actions against another supplier does not support a finding of attempt to monopolize the market. At trial, Sierracin presented an exhibit relating to a 1976 dispute between Boeing and the Air Force as to PPG's rights in certain tooling if awarded a spare parts manufacturing contract by the Air Force. Boeing had initially claimed exclusive rights but later admitted this was a mistake and withdrew its objection. Sierracin's exhibit 1000 is a letter by a nonlawyer Air Force official to a Boeing official, accusing Boeing of "illegal restraint of trade" and "noncompetitive practices". The exhibit does not establish any damage to Sierracin, as Sierracin had not entered the glass window manufacturing business until 4 years later, and never at any time manufactured the military observation windows there at issue. Speculation based on the letter is not permitted to establish antitrust injury and damages. *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 90 L. Ed. 652, 66 S. Ct. 574 (1946).

(c) Evidence of other acts. We have considered the entire record and Sierracin's assertions of various other acts by Boeing that it alleges constitute anticompetitive conduct. Many of those actions preceded Sierracin's entry into the market and the evidence does not support a causal relationship between the acts and any damages to Sierracin. With respect to the remainder, we find that Boeing's actions fall well within the protection of RCW 19.86.920 of "acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest . . ."

### 3. Injury and Damages

 Even if Sierracin had shown an antitrust violation by Boeing, it has failed to prove injury and damages. Injury and damages are essential elements of an antitrust action. *E.g., Syufy Enters.*, 783 F.2d at 887. To establish injury and damages, Sierracin needed to show at least a reasonable probability of causal connection between Boeing's acts and Sierracin's alleged loss. *Consolidated Dairy Prods. Co. v. Bar–T Ranch Dairy, Inc.*, 97 Wn.2d 167, 179–80, 642 P.2d 1240 (1982); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir.), *cert. denied*, 355 U.S. 835 (1957). While reasonable inference is permitted, speculation is not. *Bigelow*, 327 U.S. at 264.

A potential new market entrant must have taken "substantial demonstrable steps" to enter the industry and have been thwarted by the antitrust violator in order to recover damages. *Parks v. Watson*, 716 F.2d 646, 659–60 (9th Cir. 1983). Although Sierracin did take steps to enter the 7/7/7 windows market in 1982, it was only with Boeing's financial and technical aid as a Boeing supplier. Thereafter, Sierracin did not attempt to enter the spare parts direct sales market until after it lost the Boeing contract. Then, instead of taking reasonable good faith steps to lawfully enter that market, Sierracin chose to misappropriate Boeing data. To date, Sierracin's attempts to reverse engineer the windows have failed, and there is no indication in the record that Sierracin was capable of legally entering the market.

We therefore reverse the jury verdicts against Boeing for lack of substantial evidence of any violation of RCW 19.86 and for failure to prove injury and damages.

### DAMAGES, INJUNCTION, AND ATTORNEY FEES
### 1. Punitive Damages

 Prior to trial, the parties agreed that the court would decide the issue of punitive damages. RCW 19.108-.030(2) allows the court to award up to twice the amount of actual damages as punitive damages. The decision to award these damages is discretionary with the trial court and the

amount of award will not be reversed unless clearly erroneous. *See Sperry Rand Corp. v. A–T–O, Inc.,* 447 F.2d 1387, 1394–95 (4th Cir. 1971), *cert. denied,* 409 U.S. 892 (1972).

The record indicates that Sierracin knew its actions to be of dubious legality, and engaged in a massive effort to disguise its copying of Boeing's drawings. The trial court did not believe that Sierracin ever entertained any honest doubt as to the legality of its conduct, but took a calculated risk and lost. Finding of fact 5. The evidence in the record justifies this conclusion. The trial court's decision that Sierracin's actions were willful and malicious is not erroneous and the award of punitive damages is affirmed.

## 2. Injunction

RCW 19.108.020(1) provides in part that "[a]ctual or threatened misappropriation may be enjoined." The trial court enjoined Sierracin from future use of Boeing 7/7/7 cockpit window drawings and information derived from those drawings, with a limited grace period to allow Sierracin to complete some of its contractual obligations. Sierracin objects to this injunction on the grounds that the trial court made no finding of irreparable harm, the injunction is too vague, and that the injunction is perpetual and punitive. To the extent that Sierracin argues that the injunction should not be allowed because of Boeing's antitrust violations, we do not consider the argument, having found that no such violations occurred.

Sierracin argues that a finding of irreparable harm must be entered in order to support the trial court's injunction. We disagree. Neither the Uniform Trade Secrets Act nor the civil rules about injunctions require such a finding. RCW 19.108.020(1); CR 65(d). To allow Sierracin in this case to continue to manufacture cockpit windows after deciding that it had misappropriated the information from Boeing would permit Sierracin to profit from its own wrongful conduct. The trial judge found that an injunction would not be unreasonable (finding of fact 10), and we agree. No finding of irreparable harm need be found to

support this decision.

Sierracin also challenges as vague the prohibition against using information or materials derived from Boeing drawings, tooling and Sierracin FAA authorized drawings, and against employing those who "reviewed or had knowledge" of Boeing drawings, tooling, or derivative information. Seirracin asserts that it cannot determine what information was derived from Boeing's drawings, and unless the term "derived from" is defined, the injunction is too vague and compliance impossible. Nevertheless, 6 months after trial, Sierracin employees signed affidavits certifying compliance with the injunction, both as to information derived from Boeing drawings and as to engineers knowledgeable about them. Furthermore, RCW 19.108.010(2)(b)(ii)(A) uses the words "derived from" in the definition section of the Uniform Trade Secrets Act, indicating that the term is not inherently vague. The injunction is sufficiently definite for Sierracin's compliance.

In its findings of fact the trial court rejected Sierracin's argument that the injunction is "perpetual and punitive." The court found that to allow a 4–month, 5 percent royalty and subsequent free use of the secrets would be "wholly inequitable," allowing Sierracin "to get, by Court order, what it couldn't get by negotiation with Boeing, and get it cheap at that." Report of Proceedings, at 46.2–.3.

The duration and scope of an injunction are decided on the facts of each case at the trial court's discretion. *Washington Fed'n of State Employees, Coun. 28 v. State,* 99 Wn.2d 878, 887, 665 P.2d 1337 (1983). An injunction will be reversed only where the trial court fails to set forth any reasons for it and fails to include findings or conclusions. *See Turner v. Walla Walla,* 10 Wn. App. 401, 405, 517 P.2d 985 (1974).

Such is not the case here. The potential harm to Boeing as trade secrets holder extends beyond a mere calculation of monetary damages. Failure to enjoin present and future copying would be inequitable, allowing Sierracin to profit from use of its ill–gotten gains. Such failure would also

subject Boeing to repeated pirating of its trade secrets. An injunction is necessary to prevent misappropriation by Sierracin and others, and therefore we uphold the trial court's order. Although the injunction was stayed pending appeal, *Boeing Co. v. Sierracin Corp.*, 43 Wn. App. 288, 716 P.2d 956 (1986), we have previously lifted the secondary stay so that the subject injunction can take effect.[4]

We note in passing that Sierracin's final claim that the injunction is perpetual is untrue. RCW 19.108.020(1) specifically allows Sierracin to apply to the superior court to have the injunction lifted when Boeing's trade secrets cease to exist.

### 3. Attorney Fees

Boeing is entitled to its attorney fees, both at trial and on appeal. The trial court found that Sierracin's misappropriation of Boeing trade secrets was intentional, willful and malicious, and then determined attorney fees to Boeing under authority of RCW 19.108.040. Since no Washington case discussed this statutory standard, the court applied the same approach adopted from the similar language of RCW 19.86.090. *See Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 596–97, 675 P.2d 193 (1983).

The trial court first calculated the number of hours devoted to Boeing's claims and then multiplied that number by a reasonable rate. However, at this point the court reduced the amount by 30 percent due to the novelty of issues involved. The court noted that the hourly rate for Boeing's attorneys was very high in comparison to those of Sierracin's attorneys, and there was an insufficient breakdown of time spent by Boeing attorneys. The court reduced

---

[4]While we recognize that our decision renders moot the question of what type of security should have been posted as a supersedeas bond, we believe that the trial court's determination of the terms of the bond was incorrect. The Court of Appeals believed "that a stay of the injunction will adversely affect Boeing but that the adverse effect can be measured in terms of a monetary amount." *Boeing*, at 292. We believe the trial court's decision to award only 5 percent of the sale price of each 7/7/7 window Sierracin sold pending the appeal, plus a $50,000 bond for attorney fees and costs, was grossly inadequate and failed to account for all the various damages Boeing might suffer pending appeal.

the amount attributable to Boeing's clerks, and further reduced the remaining amount by 20 percent for antitrust issues, which Boeing lost at the trial level. Boeing contends that this entire method was improper, and that its fee award should not be decreased because of the novel issues involved.

 The amount of a fee award is discretionary, and will be overturned only for manifest abuse. *Bowers*, at 595–96. Fee requests may be adjusted upward or downward, and deference is awarded the trial court's decision. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983). Nevertheless, we disagree with the method used by the trial court.

A trial court abuses its discretion by reducing the fee award simply on the basis that the issues presented are novel. A trial court may reduce the fee because it believes the number of hours billed are excessive or unnecessary, or the hourly rate charged is too high. If the court finds an excessive number of hours are incurred in the presentation of a case, the court should deny any compensation for excessive hours. In addition, if the court finds the hourly rate is "too high" or excessive, the court may reduce the hourly charge. In fact, we recently held in *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 733 P.2d 208 (1987) that the trial court should not determine a reasonable attorney fee merely by reference to the number of hours which the law firm representing the prevailing party bills. Other factors, including the reasonableness of the hourly rate and reasonable amount of time required to present the party's case should be considered, and consideration should be given to the type of case involved. The rate a firm can charge for complicated, specialized advice (tax planning, etc.) has little bearing on the reasonable rate for an antitrust or trade secrets case. To reduce a fee on the basis of the novelty of the claim, however, is not a relevant concern.

Finally, Boeing argues that since we have reversed Sierracin's antitrust verdict, it should also receive its fees connected with defending against these antitrust claims. We

disagree. In *Nordstrom,* we held that when a number of actions are argued and only some of those allow for recovery of attorney fees, it would give the prevailing party an unfair benefit to award attorney fees for the entire case. Rather, attorney fees should be awarded only for those services related to the causes of action which allow for fees. *Nordstrom,* at 743.

In this case, Boeing should therefore receive attorney fees for its successful trial and appeal of the trade secrets issue. Had Sierracin raised the antitrust issue only as a counterclaim, and not as an affirmative defense, Boeing would not recover any of its attorney fees on that antitrust issue. Since Sierracin did raise this issue as a defense to Boeing's trade secrets claim, Boeing should receive its attorney fees for that part of the antitrust issue that can be fairly related to the affirmative defense. The attorney fees that Boeing incurred on the antitrust counterclaim, however, are not recoverable.

Our careful review of the entire record indicates to us, however, that the final award the trial court arrived at for Boeing's attorney fees was just and equitable. The trial court correctly discounted the hourly rate of Boeing's attorneys as there is no reason why Boeing's counsel should be charging a higher rate than Sierracin's. The final award of $353,565.45 is affirmed.

Finally, we note that the trial court's determination of costs seems to us excessive. Costs have been narrowly defined in RCW 4.84.010 as a narrow range of expenses, including filing, witness fees, and service of process expenses. *See Nordstrom, Inc. v. Tampourlos, supra.* Boeing's attorneys should not be able to inflate their cost bill to recover additional fees, and the costs recovered should be strictly limited to those defined in RCW 4.84.010.

## LIBBEY

Sierracin added Libbey as a third party defendant after Boeing sued for misappropriation of its proprietary data. The court granted a directed verdict and dismissed Libbey

after approximately 9 weeks of trial and before the case went to the jury.

Sierracin argued that its liability, if any, should be shared or attributed to Libbey, which had transferred all of its customer drawings to Sierracin at the time Sierracin purchased Libbey's glass window manufacturing business. Sierracin asserts that Libbey knowingly sent it Boeing's drawings, which Sierracin claims not to have known were for restricted use; that Libbey did not inform Sierracin of the proprietary nature of any Boeing materials as to Sierracin's use; and that whether the Boeing drawings here litigated were part of the Libbey contract was a question of fact for the jury and not subject to summary dismissal.

There was no error in the dismissal. The standard for directed verdict is to view all material evidence and reasonable inferences in favor of the nonmoving party; if no substantial evidence is presented to create a prima facie case, the motion is granted as a matter of law. *Shelby v. Keck,* 85 Wn.2d 911, 913, 541 P.2d 365 (1975). Boeing never claimed that Sierracin wrongfully used Libbey drawings to generate Sierracin drawings or to obtain its new authorization, nor did Boeing claim that Sierracin had used the Boeing drawings transferred at the time of sale. Instead, Boeing claimed that Sierracin copied the updated drawings which Boeing had sent to Sierracin directly.

In addition, although transfer of the drawings was not technically a part of the sale, Sierracin knew that any transferred drawings were confidential and for restricted use. The court noted that Sierracin could not argue that the drawings were covered by the sale agreement, and then contend that the drawings passed into the public domain so that the restrictions would not apply. Even taking all evidence and reasonable inferences in favor of Sierracin, Sierracin did not present a prima facie case for recovery against Libbey, and the court correctly granted a directed verdict dismissing Libbey.

## CONCLUSION

We affirm the trial court's double damage award against Sierracin and in favor of Boeing in the amount of $3,270,666 plus attorney fees and costs. Boeing's trade secrets claim was not preempted by federal law, nor was it subject to an antitrust affirmative defense or otherwise affected by consolidation of claims. The trade secrets were not readily ascertainable from another source, nor were they lost through tooling, transfer of Libbey drawings, or publication of exhibits at trial.

We set aside and dismiss with prejudice Sierracin's judgment and attorney fees on its antitrust claims. Substantial evidence does not support Sierracin's jury verdict on its antitrust counterclaims against Boeing, and Sierracin failed to prove any causal antitrust injuries.

We affirm the directed verdict dismissal of third party defendant Libbey–Owens–Ford.

Stay of the subject injunction is permanently lifted.

We uphold the trial court's finding of willful and malicious misappropriation of Boeing's trade secrets and its award of exemplary damages and attorney fees against Sierracin.

We uphold the trial court's award of $353,565.45 to Boeing for reasonable fees at trial, and remand to the trial court for the determination of reasonable attorney fees on appeal and costs during the trial and on appeal.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.