[No. 62417-2-I.   Division One.   July 6, 2009.]

RICHARD PETTERS, *Appellant*, v. WILLIAMSON & ASSOCIATES, INC., *Respondent*.

156

*Robert L. Wilson*, for appellant.

*Raymond H. Siderius* and *Charles R. Lonergan, Jr.* (of *Siderius Lonergan & Martin, LLP*), for respondent.

¶1 DWYER, A.C.J. — For the second time this trade secrets case comes before us. In an unpublished 2003 decision,[1] we affirmed a 2001 trial court ruling enjoining Williamson & Associates, Inc., from further misappropriating Richard Petters' design of a particular seafloor drilling technology (referred to here as "remote rod-core drilling"). Presently at issue is a 2008 ruling by the trial court that dissolved the 2001 injunction based on the court's conclusion that remote rod-core drilling no longer constitutes a trade secret. Petters contests this ruling as well as several rulings on novel claims that he raised in response to Williamson's petition to dissolve the injunction, in particular the court's rejection of his demand for additional royalties and his claim that another remote seafloor drilling technology developed by Williamson ("wire-line drilling") constituted further misappropriation. Williamson, in turn, cross-appeals attorney fee and exemplary damage awards resulting from its violation of the injunction. Holding that the trial court correctly applied the law and that the court's challenged factual findings are supported by substantial evidence, we affirm in all respects.

---

[1] *Petters v. Williamson & Assocs., Inc.*, noted at 115 Wn. App. 1047 (2003).

## Background

¶2 Petters is a design engineer who specializes in underwater engineering. Ex. 67 (2001 Memorandum Ruling) (MR) at 1. Beginning in the early 1980s, Petters worked with Williamson to design and market a remotely operated, deep-ocean rock coring drill. MR at 2-5; Clerk's Papers (CP) at 995. Around 1992, Petters began adapting land-based drilling technologies for that purpose. MR at 5-6; CP at 996.

¶3 In 1994, a Japanese Company, Nichiyu Giken Kogyo Co., Ltd. (NGK) expressed interest, on behalf of the Japanese government, in acquiring a seafloor drill based on the technology being developed and marketed by Williamson. MR at 6-7; CP at 996. Petters then prepared a successful bid proposal for NGK on Williamson's behalf. MR at 7; CP at 996-97.

¶4 Based on this bid, Williamson contracted with NGK to provide a completed remotely operated seafloor drill, referred to as the first "BMS" drill, or "BMS-I."[2] The drill was unique because it adapted an established land-based technology, rod-core drilling, for remote use on the seafloor. With the use of remote rod-core drilling, the purpose of the drill—taking consecutive cylindrical samples of subsurface material, or "core"—is achieved by advancing into the seafloor a long "drill string" tipped with a circular drill bit. The drill string consists of numerous three-meter-long sections of pipe, or "core barrel," which can be advanced at any given time far enough to retrieve approximately two meters of core.

¶5 In order to retrieve any new two meters of core, however, the operator of the drill must disassemble the entire existing drill string (i.e., the string that has been used to retrieve the previous core sample) by unthreading each piece of core barrel from the next piece, and then,

---

[2] "BMS" is variously described as standing for "benthic multicoring system" and "boring machine system." *See* MR at 7; Plaintiff's Ex. 20.

ultimately, removing the sample from the piece of core barrel at the tip of the drill string. In order to retrieve another sample after this is done, the entire drill string must be reassembled piece-by-piece, another length of core barrel added, and the process repeated. Report of Proceedings (RP) (Jan. 3, 2008) at 41-42. Given the nature of the technology, the amount of time required to retrieve any sample increases exponentially in relation to its subsurface depth.

¶6 After Williamson contracted to supply NGK with the BMS-I drill, Petters and Williamson disagreed about the compensation due Petters. MR at 10-11. Soon thereafter, Petters ceased working for Williamson. In 1999, Petters brought this lawsuit against Williamson. As is relevant to this appeal, Petters alleged that Williamson had misappropriated trade secrets owned, in part, by Petters—specifically, BMS-I's unique adaptation of rod-core drilling technology to remote seafloor operation—and sought both an award of damages and the entry of an injunction prohibiting further misappropriation. CP at 997.

¶7 Following a four-day bench trial, the trial court ruled that Williamson had misappropriated Petters' trade secrets. Specifically, the court found that

> the drill design itself and how it is arranged is not information available in the public domain. . . . Some components of the drill design are not unique, but the total configuration is.

MR at 15. Based on this finding, the court ruled that Williamson had misappropriated the BMS technology by transferring it to a subsidiary company without Petters' authorization. MR at 17-18. Although the court concluded that Petters had "not proved that he suffered any 'actual loss' as a result of the misappropriation," it also concluded that it was appropriate to enjoin further misappropriation. It further required Williamson to pay to Petters six percent of the gross proceeds obtained as a result of any future transfer of the technology. MR at 19.

¶8 Both Petters and Williamson appealed to this court, which affirmed the trial court's order in its entirety. CP at

1016. Petters sought discretionary review by our Supreme Court, but review was denied. CP at 974.

¶9 Time passed. During that time, unbeknownst to Petters, Williamson had capitalized on the success of the BMS-I drill to seek, and win, a highly competitive contract to design and build a second remotely operated seafloor coring drill for NGK. CP at 976. Based on its award of the contract, Williamson manufactured a second drill, the BMS-II, which utilized a technology almost identical to that designed by Petters. According to the trial court, "[t]hat deal most definitely involved the very technology that the Court described in its injunction." RP (April 18, 2008) at 86. The contract also included a "BMS License Agreement," which provided to NGK "an exclusive license to manufacture, use and sell BMS" technology in Japan, Korea, China, and Taiwan. Plaintiff's Ex. 13, at 2. Ultimately, NGK agreed to pay Williamson $3.45 million. CP at 976-77.

¶10 Petters first learned of this transaction after Williamson had already entered into the contract with NGK. RP (Apr. 18, 2008) at 45. He immediately demanded that Williamson cease all disclosure of the BMS technology. CP at 116. Williamson refused this demand, asserting that while the 2001 injunction required payment of royalties to Petters, it did not require authorization from Petters prior to disclosure of the BMS technology. CP at 118, 121. Petters vehemently disputed this interpretation of the injunction.

¶11 Williamson responded in two ways: first, by commencing incremental payments of six percent royalties to Petters, and, second, by reopening this lawsuit, filing with the trial court in December 2006 a pleading entitled "APPLICATION TO TERMINATE TRADE SECRET INJUNCTION AND TERMINATE OBLIGATION TO PAY ROYALTY AND FOR TESTIMONIAL HEARING." CP at 1-16. In addition to the relief described in the pleading's heading, Williamson also sought to establish that the contract with NGK had not constituted a violation of the 2001 injunction, i.e., that Williamson, by paying to Petters six percent of the roughly

$3.45 million in new gross revenues[3] obtained from NGK, was in compliance with the court's 2001 ruling. CP at 16.

¶12 Discovery recommenced. Because Williamson declined to comply with the trial court's order compelling it to produce certain documents, the trial court imposed sanctions pursuant to CR 37(b)(2). CP at 553-54. However, Petters argued that, in order to punish Williamson properly, the court should also exclude certain highly relevant expert testimony regarding the international development of seafloor drilling technology in the period since the entry of the injunction. The court rejected this proposed sanction in favor of imposing monetary sanctions:

> I am not really willing to risk an outcome in a case on erroneously excluding evidence. . . .
>
> I want to draw to your attention [to] my specific concerns in this case. First, I really want to get all the evidence that is pertinent in this case. . . .
>
> Another concern that I have here is that if the Court leaves out information, for example, about what else is out there in the market, not only does that inhibit the ability to appropriately decide this case but it inhibits the ability for me to figure out whether or not, for example, this technology is sufficiently in the market that the trade secret has evaporated.

RP (Jan. 3, 2008) at 9-10.

¶13 Discovery also revealed that Williamson had filed an application for a patent on another seafloor drilling technology, described as a "new and unique concept for robotic seafloor drilling using wireline technology." CP at 186. The eventual disclosure of this patent application led Petters to discover that, in the years since the sale of the BMS-II drill, Williamson had adapted wire-line drilling (like remote rod-core drilling, originally a land-based drilling technology) for use in a portable, remotely operated drill rig that

---

[3] The actual amount paid by NGK under the BMS-II contract was $3,406,820, due to an offset in the contract price "because NGK had billed Williamson $43,180 for two items manufactured by NGK." CP at 977.

could be deployed from ships of opportunity rather than dedicated drilling vessels.

¶14 Like remote rod-core drilling, wire-line drilling involves a drill string composed of approximately three-meter sections of core barrel that thread together and are tipped by a circular drill bit that carves out cylindrical core samples. Unlike rod-core technology, however, wire-line technology does not require the disassembly and reassembly of the drill string for the retrieval of each successive core sample. Rather, a component called an "overshot," which is attached to a wire, retrieves the core samples through the assembled drill string. RP (Jan. 3, 2008) at 43-44.

¶15 Discovery also revealed that Williamson had already relied upon this technology—marketed, in part, based on Williamson's success with the BMS-I and BMS-II drill projects—to secure a contract with an agency of the government of India, the National Institute of Ocean Technology (NIOT), to develop a drill referred to as the "wire-line autonomous coring system (ACS)." Plaintiff's Ex. 32.

¶16 After learning of the ACS drill project, Petters in effect counterclaimed against Williamson's application to terminate the injunction. He argued, first, that Williamson's BMS-II contract with NGK had violated the injunction. Second, he argued that he was entitled to additional damages due to the lateness of the six percent BMS-II royalty payments. Third, he argued that the ACS drill, like the BMS-II, was based on the technology that he had designed while working for Williamson and, as such, constituted a further violation of the injunction, entitling him to additional royalties. Finally, he argued that Williamson's violations of the injunction—the BMS-II/NGK contract and, allegedly, the ACS/NIOT contract—entitled him to attorney fees and double damages.

¶17 After another full bench trial before the same judge who had issued the 2001 injunction, the trial court found that no less than four companies had independently developed remotely operated rod-core-based seafloor drills since 2001 and that, as a result, "the BMS I technology . . . will

lack independent value in the near future and accordingly will no longer qualify as a trade secret under the statutory definition." Based on this finding, the court ordered the injunction dissolved as of April 18, 2009.[4] CP at 979.

¶18 Next, the trial court concluded that the licensing portion of the BMS-II/NGK contract constituted a willful and malicious misappropriation of the BMS trade secrets. Accordingly, the court awarded Petters attorney fees and double interest on late royalty payments from the contract. CP at 975-76, 984.

¶19 Next, the trial court ruled that because there was no evidence that NGK had disclosed any BMS technology or produced any BMS-style drills, Petters failed to prove that the license granted to NGK in the BMS-II contract had actually caused him any damage. As a result, the trial court declined to designate a portion of Petters' unjust enrichment damages as being directly attributable to the license agreement. CP at 976-77, 984.

¶20 Finally, the trial court ruled that, while the ACS drill shared some characteristics with the BMS-style drills in which Petters formerly had a property interest, it was not derived from those drills and, thus, did not constitute a further misappropriation by Williamson. Accordingly, the trial court ruled that Petters was not entitled to royalties from the ACS/NIOT contract. CP at 980-81, 983-84.

¶21 Both parties appeal.

## Standards of Review

¶22 "Where the trial court has weighed the evidence our review is limited to determining whether the findings are supported by substantial evidence and, if so, whether the findings in turn support the trial court's conclusions of law. . . . Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Holland v. Boeing Co.*, 90

---

[4] We stayed the execution of this order pending our decision.

Wn.2d 384, 390-91, 583 P.2d 621 (1978). "We review the trial court's conclusions of law de novo to see if they are supported by the trial court's findings of fact." *Bingham v. Lechner*, 111 Wn. App. 118, 127, 45 P.3d 562 (2002). "A trial court exercises broad discretion in imposing discovery sanctions under [CR] 37(b), and its determination will not be disturbed absent a clear abuse of discretion." *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

## Unjust Enrichment Damages

¶23 Petters first contends that the trial court erred as a matter of law because it applied an incorrect burden of proof to determine the degree to which Williamson's license of the BMS technology monetarily damaged him. Petters asserts that once misappropriation has been found, the burden is on the misappropriating party to prove that any portion of the wrongfully obtained revenue is not attributable to the misappropriation. While Petters is correct regarding the burden of proof, he is incorrect in averring that the trial court misapplied it here.

¶24 The burden of proving the measure of damages in cases addressing misappropriation of trade secrets is not a subject that has received significant attention from Washington's appellate courts. It is well established, however, that "[a] plaintiff seeking to establish a trade secrets claim under the uniform act[5] has the burden of proving that legally protectable secrets exist." *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 49, 738 P.2d 665 (1987). Likewise, there is no legitimate question that it is the burden of the party seeking relief under the Uniform Trade Secrets Act, chapter 19.108 RCW, to demonstrate that such a secret has actually been misappropriated in order to have a right to any damage award. *See, e.g., Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1668, 3 Cal. Rptr. 3d 279 (2003). The question here is: once these things are estab-

---

[5] Uniform Trade Secrets Act, ch. 19.108 RCW.

lished, how is the burden of proving the proper amount of restitutionary unjust enrichment damages allocated as between the plaintiff and defendant?

¶25 Petters points to the *Restatement (Third) of Unfair Competition*:

> The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the defendant's profits on sales attributable to the use of the trade secret. . . . The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. f. at 516-17 (1995).

¶26 This is a logical and unremarkable formulation of the rule. It places on the party in possession of the relevant information—the defendant—the burden of demonstrating which portion, if any, of the revenue obtained through the transfer of a trade secret was not, in fact, attributable to the transfer. That is, it requires the defendant to explain why any particular portion of the money that it received as a result of the misappropriating transaction should *not* be considered an "actual loss" suffered by the plaintiff under RCW 19.108.030(1). The rule has been widely adopted in jurisdictions applying the model act. *See, e.g., Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 450 (2d Cir. 1998). Moreover, Williamson does not actually advance a contrary rule. Accordingly, we too adopt the *Restatement*'s approach.

¶27 Problematically for Petters' argument, however, is the fact that this is the rule that the trial court actually applied in this case. That is, Petters is mistaken when he contends that de novo review is appropriate because the trial court "misapplied" the rule. The court did not misapply the rule. It is true that Petters met his burden of demonstrating the total value of the BMS-II contract. But Williamson *also* met its burden by producing evidence

showing that Petters suffered *no* separate damages as a result of the license portion of that contract. Contrary to Petters' contention, Williamson was not required to present evidence that some portion of the price of the BMS-II contract *greater than zero* was attributable to the license of the BMS technology.

¶28 That is to say, the burden of proof does not require that a defendant *admit* that any particular portion of a transaction constitutes a particular misappropriation. Rather, Williamson met its "burden of establishing [the] portion of the sales not attributable to the trade secret" in relation to the license by presenting evidence that the license did not *independently* increase the sale price. In other words, although Williamson undeniably misappropriated the BMS technology by licensing it to NGK, the trial court was not required to accept Petters' assertion that Williamson was required to demonstrate that the license had value apart from that obtained through the overall sale of the BMS-II drill. Thus, whether Williamson demonstrated that the license was without independent value devolves into a factual question, not a legal one.

¶29 We hold that the trial court's findings on this matter are supported by substantial evidence. Contrary to Petters' assertions, the trial court reasonably could have concluded from the evidence presented that Williamson's license of the BMS technology could not realistically be separated from the overall BMS-II contract price but, rather, served as an inducement to NGK that did not have independent value.[6] Specifically, Williamson demonstrated that this was the

---

[6] Some clarification may be useful regarding the significance of whether the license agreement constituted a separate damage amount. After all, Petters has already received the six percent in royalty payments from the BMS-II transaction to which he was entitled under the 2001 injunction. However, the trial court found as a factual matter that the only portions of the BMS-II transaction that were "willful and malicious" were (1) Williamson's lateness in paying royalties and (2) the license agreement. RCW 19.108.030 allows for double damage awards on willful and malicious misappropriations. Thus, if a specific numerical amount of the BMS-II transaction price must be attributed to the license agreement, the damages for that portion of the misappropriation could then be doubled pursuant to the court's factual finding.

case by showing that NGK has not attempted to develop, manufacture, or market anything based on the BMS technology in the period since the BMS-II contract was secured by Williamson. *See, e.g.*, RP (Jan. 7, 2008) at 44 (testimony of Michael Williamson). Moreover, Williamson presented evidence—albeit contested evidence—by which the trial court reasonably could have found, and did find, that the license agreement was a standard term in Williamson's bid to produce the BMS-II drill and was not negotiated separately from the purchase price.

¶30 As Williamson contended in argument before the court, "Mr. Williamson was giving a three and a half million dollar bid price to everybody. He gave that to three separate . . . possible co-bidders. And NGK . . . that was the same thing, same price, three and a half million dollars." 4 RP at 79. As Williamson pointed out, these co-bidders all had different capabilities, and the price quoted to NGK was the same regardless of the specific co-bidder. Williamson also presented uncontroverted testimony that NGK has neither manufactured a BMS-style drill nor contracted with anyone other than Williamson to manufacture such a drill.

¶31 Thus, we conclude that the evidence supported the trial court's factual finding that the undivided BMS-II contract price was the correct basis upon which to calculate unjust enrichment damages, and that Williamson's royalty payments to Petters properly compensated him. The evidence did not require a separate damage award based on the license agreement.

## Termination of the 2001 Injunction

¶32 Petters next contends that the trial court, in dissolving its 2001 trade secret injunction, "misapplied" the legal standard for determining whether Petters' trade secret in the BMS technology has ceased to exist. This contention both misstates the trial court's ruling and is unsupported by the law.

¶33 RCW 19.108.010(4)(a) defines "trade secret" as "information . . . that . . . [d]erives independent economic

value, actual or potential, from not being generally known to, and not being readily ascertainable by . . . other persons who can obtain economic value from its disclosure or use." Thus, it is well established that a trade secret ceases to exist once it becomes "generally known," whether or not the former trade secret enters the public domain through independent development by other parties or as a result of reverse engineering of a product that incorporates the secret. *Boeing*, 108 Wn.2d at 49-50.

¶34 This is precisely the standard applied by the trial court. The trial court entered as a conclusion of law: "It appears there has been independent development in the marketplace of four other drills which appear to be in commercial application, and to perform the same essential function as the BMS I seafloor rod core drill." CP at 982.

¶35 Notwithstanding this, Petters contends that the trial court misapplied the law. Petters makes much of the precise engineering drawings and computer subroutines that went into the construction of the BMS-I drill, apparently believing that unless Williamson's competition somehow obtained these things, there is no conceivable way (absent actual, demonstrated reverse engineering) that the BMS technology could cease to be secret. This assertion is based on Petters' misapprehension of the nature and scope of the 2001 injunction and, again, his misunderstanding of the nature of the applicable legal standard.

¶36 First, Petters' contention that the trial judge misunderstood the scope of her own injunction is without merit. Contrary to Petters' argument, the injunction protected from misappropriation the *combination* of otherwise unremarkable technologies that together comprised the BMS drills, not the unremarkable technologies themselves. Specifically, the 2001 ruling determined that the BMS technology was unique and secret because the BMS-I drill was

> a *combination* of the following: allowing the surface operator of a remote seafloor drill control of RPM [(revolutions per minute)], bit rate, advance of bit, and flushing, allowing the operator to receive feedback by displaying the status of all

instrumentation on the drill, preventing the likelihood of operator error on unseen, repetitive processes by feeding sensors into a computer and permitting automatic control via computer, using rotary rod drilling techniques used on land such as threading core barrels together to advance the borehole, and to set casings and modifying those techniques for deep sea use.

MR at 14 (emphasis added).

¶37 Second, there is no merit to Petters' contention that, in order for the BMS technology to have been independently developed, Williamson's competitors had to obtain the engineering drawings and computer subroutines that Petters designed. Obviously, such development would not be "independent." Under Petters' theory, independent development could *never* result in a trade secret ceasing to exist by virtue of becoming generally known. This is not the law.

¶38 In summary, then, the trial court applied precisely the correct legal standards to determine whether Petters' trade secret in remote rod-core drilling had ceased to exist. The only remaining question, then, is whether substantial evidence supports the trial court's factual finding that the secret has been sufficiently independently developed to become "generally known."

¶39 Applying the correct standard of review, substantial evidence supports the trial court's factual finding that the trade secret encompassed by the 2001 injunction has ceased to exist. Williamson presented voluminous expert and lay testimony that no less than four separately designed, remotely operated portable seafloor drilling units that rely on rod-core technology and that operate in an essentially identical manner to the BMS-I are currently being actively marketed by Williamson's competitors. This testimony was supported by extensive documentary evidence. Although Petters unsuccessfully attempted to have this evidence excluded, he was unable to refute it.

## The ACS Drill

¶40 Petters again confuses the proper standard of review in contending that the trial court "misappl[ied]" the law in finding that the ACS drill did not constitute a further misappropriation of BMS drill technology. *See* Br. of Appellant at 29, 40.

¶41 RCW 19.108.010(2)(b)(ii)(C) defines "misappropriation" of a trade secret as its "[d]isclosure or use" by a person who knows or has reason to know that his or her knowledge of the secret was "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Thus, Williamson could be liable for misappropriating the BMS drill technology by knowingly using the technology in another application derived therefrom.

¶42 This is precisely the legal standard utilized by the trial court in determining whether the ACS/NIOT project constituted a further misappropriation. *See* CP at 983 (listing differences between the technologies "[m]easur[ed] . . . by application of the substantially derived from test"). Petters' contention that the trial court utilized an incorrect legal standard is meritless. The alleged misapplication of the law devolves, again, into a challenge to the trial court's factual findings.

¶43 Again applying the correct standard of review, we conclude that substantial evidence supports the trial court's factual finding that the ACS/NIOT drill was not substantially derived from the BMS drill technology. A significant portion of the testimony before the trial court consisted of testimony by Williamson's experts and, in particular, the testimony of Timothy McGinnis. McGinnis provided detailed discussions of both rod-core and wire-line drilling technologies, and opined that the use of wire-line technology in seafloor drill units involved such different engineering challenges that he could not conclude that the ACS/NIOT drill was derived from the BMS technology. Rather, in

McGinnis's opinion, the ACS/NIOT drill constituted a unique application of remote operation technology to a *different* drill system. RP (Jan. 3, 2008) at 60-63.

¶44 Petters' own counsel stated that "if we're talking about the expertise of Mr. McGinnis in seafloor drilling I can think of very few people with more expertise than him. We stipulate to his extraordinary experience and expertise in seafloor drilling." RP (Jan. 3, 2008) at 25. It is curious, then, that Petters now contends that the trial court was required to disregard McGinnis's expert opinion. This contention, of course, is without merit.

## The CR 37(b)(2) Sanctions

¶45 Finally, Petters contends that the trial court abused its discretion by refusing to exclude Williamson's expert testimony as a sanction for Williamson's violation of the court's order compelling discovery. According to Petters, the trial court abused its discretion by applying the "wrong legal standard," Br. of Appellant at 47, because it implicitly utilized the sanctions test articulated in *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997), rather than the rule stated in *Mayer*, 156 Wn.2d at 684, which, according to Petters, "overruled" *Burnet*.

¶46 The problems with this argument are many and varied. First, *Mayer* did not overrule *Burnet*. Rather, it declined to extend *Burnet* to CR 26(g) sanctions, as opposed to CR 37(b)(2) sanctions. *Mayer*, 156 Wn.2d at 688-89. Second, this case involves CR 37(b)(2) sanctions, so (by *Mayer*'s own terms) *Burnet* provides the appropriate analysis. Third, notwithstanding Petters' selective quotation from the trial court's ruling and consequently strained interpretation of the trial court's basis for its sanctions decision, the record clearly indicates that the trial court determined the appropriate sanction primarily by fairly balancing its desire to adequately punish Williamson with the necessity of making an informed ruling—an admirable application of the fundamental principles underlying the

decisions in both *Mayer* and *Burnet*. Finally, the sanction here imposed was the lesser sanction of fees, rather than the more extreme sanction of evidence exclusion, so the trial court acted appropriately under the authority of either case.

## Williamson's Cross Appeal

¶47 In its cross-appeal, Williamson contends that the factual finding of the trial court providing the basis for its attorney fee and exemplary damage awards to Petters—that Williamson acted "wilfully and maliciously" by licensing the BMS technology to NGK—is unsupported by substantial evidence. We disagree.

¶48 Throughout the proceedings in the trial court, Williamson maintained as its position that the 2001 injunction did not actually require it to obtain authorization from Petters prior to utilizing or licensing the BMS technology, provided that it paid Petters the six percent royalty ordered by the injunction. *See, e.g.*, RP (Jan. 3, 2008) at 86. The trial court expressly rejected this interpretation of its injunction. RP (Apr. 18, 2008) at 45, 85. This is not particularly surprising, given that the court's 2001 decision states, with regard to the technology transfer that actually *prompted* the injunction, "the licensing . . . without Mr. Petters' consent was misappropriation within the meaning of RCW 19.108.010(2), as any unauthorized disclosure or use is sufficient under the statute to constitute misappropriation." MR at 18.

¶49 Now, for the first time on appeal, Williamson advances the argument that, notwithstanding that it "willfully" licensed the BMS technology to NGK, it cannot be found to have acted "maliciously" because it did not actually intend to *harm* Petters by licensing the technology. Williamson protests that, indeed, because it always intended to pay Petters his royalty share of the transaction's proceeds, it only wanted to *help* Petters by licensing the technology.

¶50 This position both misstates the basis for the trial court's ruling and unjustifiably narrows the scope of that which may constitute "malicious" misappropriation. The conduct that the trial court found to be malicious was Williamson's refusal to provide Petters with any information regarding the BMS-II transaction, let alone obtain authorization to disclose the BMS technology. *See* RP (Apr. 18, 2008) at 85 (trial court's oral ruling). *Black's Law Dictionary* 977 (8th ed. 2004) defines "malicious" as "**1.** Substantially certain to cause injury. **2.** Without just cause or excuse." The only excuse that Williamson had for its conduct was its unusual interpretation of the injunction. That interpretation was erroneous and, hence, did not provide just cause for Williamson's behavior. None of the foreign cases cited by Williamson cast serious doubt on this purely factual determination.

## Conclusion

¶51 Petters requests that we award appellate attorney fees to him. But Petters is not the prevailing party on appeal.[7] Because we reject Petters' assignments of error to the trial court's rulings, we likewise reject his fee request.

¶52 Our stay of the trial court's order dissolving the 2001 injunction is vacated and the court's judgment is, in its entirety, affirmed.

Cox and LAU, JJ., concur.

Reconsideration denied August 6, 2009.

Review denied at 168 Wn.2d 1007 (2010).

---

[7] While Petters prevails on Williamson's cross appeal, we conclude that counsel's work on this issue is not realistically segregable from the work done on the rest of the case and, thus, does not provide an independent basis upon which to award attorney fees.