THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| JONATHAN WESLEY EBBELER AND ELIZABETH ASHLEY EBBELER, husband and wife, | No. 82225-0-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| SIDNEY S. ANDREWS, Personal Representative of the Estate of Alison S. Andrews; and ESTATE OF ALISON S. ANDREWS, | |
| Respondents. | |

ANDRUS, A.C.J. — Jonathan and Elizabeth Ebbeler, prospective purchasers of a home under a real estate purchase and sale agreement, appeal the trial court's finding that they forfeited their earnest money deposit by failing to tender the purchase price on or before closing, as required by the agreement. Because the trial court's findings are supported by substantial evidence, we affirm.

FACTUAL BACKGROUND

In February 2018, Alison Andrews passed away, leaving a large home in the Highlands neighborhood of Shoreline, Washington. Her son, Sidney

Citations and pin cites are based on the Westlaw online version of the cited material.

Andrews,[1] acting as her estate's personal representative (the Estate), listed the home for sale.

All property sales in the Highlands must be approved by the Highlands Homeowner's Association (HHA). HHA contracts with the Highland Sewer District (the District) to provide a sanitary sewer and storm water drainage system for the community. Under the Highlands bylaws, all buildings must be connected to the general sewer system. The Highlands Sewer District Sanitary Sewer & Storm Water Lateral Compliance Plan makes all property owners financially responsible for repairs to or replacements of sanitary sewer and storm water lateral pipelines. Under this plan, the District is responsible for inspecting sewer lines and issuing certificates of compliance. In 2005, the District implemented a policy requiring an inspection of all sewer connections when a residence is proposed to be sold and to require "immediate arrangements to correct all deficiencies found by such inspections." The District requires any seller to obtain a "Letter of Compliance" as a condition of any sale.

In April 2018, Andrews began working with the District to bring the home into compliance by separating the home's storm water from the District's sewer lines. In mid-March 2019, the District and Andrews discovered that the home had never been connected to the District's sewer system. The District issued a non-compliance report indicating that before any sale, the District had to connect the home to its sanitary sewer system.

---

[1] Because Alison and Sidney Andrews share the same last name, we will refer to Alison by her first name for clarity only.

On March 28, 2019, the Ebbelers offered to purchase the property for $2 million, using the Northwest Multiple Listing Service (NWMLS) real estate purchase and sale agreement form (REPSA). On March 30, Andrews extended a counteroffer for $2.625 million, offered a personal representative's deed in lieu of a statutory warranty deed, and required that any and all contingencies, both financing and inspections, be waived within 30 days of mutual acceptance. Andrews also disclosed the defects with the sewer system and represented that the Estate was selling the house without connecting to the District's sewer system.

On March 31, 2019, the parties settled on a purchase price of $2.3 million. The REPSA contained the Estate's proposed 30-day contingency period clause:

> Buyer shall have 30 days from mutual acceptance to conduct all inspections, document reviews, financing approval, etc. . . . After 30 days, Buyer and Seller agree that all contingencies are deemed to be waived and will proceed to closing as specified in the agreement. Buyer may elect, before the 30 days has expired, to terminate the agreement with written notice and Earnest Money will be refunded to the Buyer.

> Upon removal of Buyer's contingencies or after thirty (30) days from mutual acceptance and delivery of the Residential Real Estate Purchase and Sale Agreement, whichever is sooner, the Earnest Money shall become a non-refundable deposit applicable toward the Purchase Price and no longer Earnest Money. If this transaction fails to close for any reason other than default by Seller, the non-refundable deposit shall remain the property of Seller.

The parties agreed on a closing date of "on or before" May 29, 2019. They also agreed to use WFG National Title (WFG) as the closing agent. Once they agreed to these final terms, the Ebbelers deposited $65,000 in earnest money with WFG.

During the 30-day contingency period, the Ebbelers sought assurances that the District would complete sewer repairs before closing and asked Andrews to

reduce the purchase price and extend the closing date until the repairs were complete. The Ebbelers initially thought the District would not allow the sale to close without the sewer connection work being completed. Andrews confirmed with the HHA and the District that because the District could not complete the work by the closing date, it would allow the transaction to close if the Estate agreed to set aside a portion of the sale proceeds to cover the costs of the repairs in a "holdback" agreement.

Discussions between the parties regarding the sewer issue became contentious with the Ebbelers continuing to seek a price reduction to reflect the lack of a connection. On May 1, 2019, the Estate's attorney, Lisa Peterson, told the Ebbelers that the Estate would not negotiate the issue further and that they could walk away from the deal if they were not happy with the sewer situation. She offered to extend the feasibility period to May 3, 2019, to give the Ebbelers additional time to decide if they wanted to proceed.

The Ebbelers allowed the contingency period to lapse and all contingencies were, at that point, waived. On May 24, 2019, the District agreed to a holdback amount at $150,000, two times the anticipated cost to finish the sewer repairs. Andrews agreed that this sum would be withheld from the proceeds to be paid to the Estate at closing.[2]

The Ebbelers, residents of Maryland, worked with a mortgage broker to obtain a $1.6 million loan from Washington Federal (WaFed) to purchase the property. WaFed prepared loan documents and forwarded them to WFG for the

---

[2] In October 2019, the District completed the sewer repairs on the home and issued a statement of compliance to the Estate. The Estate's allocation of the costs was approximately $74,000.

Ebbelers to execute. WFG arranged for a traveling notary to meet the Ebbelers to execute the loan and closing papers on Saturday, May 25, 2019, four days before the scheduled closing date.

WFG mistakenly provided the Ebbelers with a draft statutory warranty deed, rather than a personal representative's deed, to approve. The Ebbelers approved the deed form, signed what they believed to be all remaining documents, and returned them via overnight mail to WFG.

WFG received the Ebbelers' signed closing documents on the morning of May 28 and forwarded them to WaFed to review. The same day, the Ebbelers wired a $690,000 down payment to WFG.

Just before 6 p.m. that evening, Dani Leggett, the closing agent, emailed Andrews and asked him to arrive at WFG's Seattle offices at 11 a.m. the next day to sign closing documents so she could "send documents to the lender prior to their funding cutoff." Leggett informed Andrews that "[t]he buyer's lender requires reviewing a portion of the seller signed documents prior to funding their loan and releasing us to record." The following morning, Andrews told Leggett that he would come in to execute the closing documents but that she did not have the authority to distribute any documents to the Ebbelers' lender until he provided written authorization for her to close.

At approximately 11 a.m. on May 29, WaFed notified WFG that it had discovered at least 13 errors in the Ebbelers' signed loan documents that needed to be corrected before it would wire funds for closing.

At 1 p.m., Peterson notified Leggett that the Estate would not authorize her to send copies of signed documents to anyone unless and until all funds had been deposited. Leggett responded that the only documents she wanted to send were the signed escrow instructions, the "closing disclosure," and the statutory warranty deed. When Peterson received this email, she told Leggett that the proper deed form should be a personal representative's deed, not a statutory warranty deed, and that she would not authorize WFG to distribute a signed deed before funds were on hand to close. She also informed Leggett that Andrews would be there by 2:30 p.m. to sign the closing documents.

Leggett then sent an email notifying everyone involved in the transaction that once Andrews arrived to sign the documents and she had the "green light" to move forward with the closing, she would let everyone know. She further stated that it was her belief that the lender's cutoff to fund the loan was 2 p.m. and suggested that the parties would need to extend the REPSA. At 1:40 p.m., the Ebbelers' mortgage broker, Phil Mazzaferro, sent an email to the parties indicating that WaFed wanted more changes to the loan documents. Barbara Otero, WaFed's loan manager, testified that the bank could not and would not fund the loan until these items were corrected.

Nothing in the record indicates if or when the errors in the Ebbelers' loan documents were corrected. Neither WaFed nor the Ebbelers ever deposited the balance of the purchase price with WFG.

Andrews arrived at WFG's offices at 2:17 p.m. and learned that WFG had prepared, and the Ebbelers had approved, the incorrect deed form. He

immediately notified his attorney of the error and she sent WFG a personal representative's deed for WFG to finalize. WFG asked its lawyer to approve the revised deed. Andrews signed all the closing documents, except the deed, by 2:48 p.m. He signed the correct deed form at 3:51 p.m. Because the King County Recorder's Office closes at 3:30 p.m., WFG would have been unable to record the deed that day.

When the Ebbelers realized the transaction would not close, they asked Andrews to extend the closing date. Andrews refused because the Ebbelers had failed to tender the purchase proceeds.

The next day, the Ebbelers filed a lis pendens against the property and brought suit against the Estate seeking specific performance and damages. They alleged the Estate breached the contract by failing to execute and deliver a deed in a timely manner and breached the duty of good faith and fair dealing by thwarting the Ebbelers' ability to fund the loan. They did not seek a rescission of the REPSA.

The Estate filed a counterclaim, alleging the Ebbelers had defaulted under the REPSA. It sought a forfeiture of the earnest money deposit and damages for the Ebbelers' wrongful filing of a lis pendens.

At trial, the Ebbelers abandoned their specific performance claim and released the lis pendens. In their opening statement, they indicated an intent to seek damages, but at trial, they presented no evidence that they had sustained any monetary damages. In closing, they asked the court to refund their $65,000 earnest money deposit plus interest. Once again, they did not ask the trial court to rescind the REPSA.

- 7 -

The trial court found the Estate did not breach the REPSA or violate any duty of good faith and fair dealing. The court found instead that the Ebbelers failed to perform by failing to pay the purchase price on or before the closing date. It deemed the Ebbelers' earnest money forfeited to the Estate and awarded it attorney fees of $264,372 based on a prevailing party clause in the REPSA. The Ebbelers appeal.

ANALYSIS

The Ebbelers argue that the trial court erred in not rescinding the REPSA and refunding their earnest money. The Ebbelers also contend the trial court erred in finding that the Estate tendered performance, that they did not do so, and that the Estate did not interfere with their ability to tender the money needed to purchase the home.

Because the Ebbelers did not seek rescission of the REPSA at trial, they did not preserve that claim for appeal. And because there is substantial evidence to support the trial court's findings, we reject the Ebbelers' appeal.

Standard of Review

We review a trial court's decision after a bench trial to determine whether any challenged findings of fact are supported by substantial evidence and whether those findings, in turn, support the conclusions of law. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). We accept as true any unchallenged findings on appeal. Real Carriage Door Co. v. Rees, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). We view all reasonable inferences from the evidence in the light most favorable to the prevailing party. Korst v. McMahon, 136

Wn. App. 202, 206, 148 P.3d 1081 (2006). We do not review credibility determinations. Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

Rescission

The parties agree that under the REPSA, their obligations to perform were concurrent in nature. It is well-established that a buyer's duty to tender the purchase price and the seller's duty to tender the deed are concurrent duties. Wallace Real Estate Inv., Inc. v. Groves, 124 Wn.2d 881, 897, 881 P.2d 1010 (1994). The Ebbelers argue that under Willener v. Sweeting, 107 Wn.2d 388, 730 P.2d 45 (1986), when both parties fail to perform concurrent duties, the trial court should rescind the REPSA. Contract rescission is an equitable remedy in which a court may restore the parties to the positions they would have occupied had they not entered into the contract. Bloor v. Fritz, 143 Wn. App. 718, 739, 180 P.3d 805 (2008). We review a trial court's decision on rescission for abuse of discretion. Id.

In Willener, the buyer failed to tender the purchase price and the seller failed to deposit into escrow a lease amendment needed for the seller to convey marketable title to the buyer. 107 Wn.2d at 396. Because the buyer failed to tender the purchase price, the Supreme Court determined that the buyer could not recover damages from the seller. Id. But it also concluded that because the seller did not perform, it was not entitled to the liquidated damages specified in the agreement. Id.

The Supreme Court noted that "[a]lthough both parties withdrew from their agreement declaring the contracting documents to be null and void, the court in essence appeared to rescind the contract." Id. at 397. Given that neither party

performed their obligations under the agreement, the court found no abuse of discretion in the trial court's decision to rescind the agreement and refund the earnest money to the buyer. Id.

The Ebbelers rely on Willener to argue that the trial court here should have returned their earnest money to them. But the Ebbelers did not ask the trial court to rescind the REPSA based on both parties' mutual non-performance. The Ebbelers have consistently argued that they did not breach any obligation under the REPSA.

The REPSA contemplated what would occur in the event of a default by the buyer or seller. Paragraph 8 of the Agreement's "Specific Terms" selected "Forfeiture of Earnest Money" as the remedy for default by the buyer. Paragraph o of the Agreement's "General Terms" provided:

> Default. In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then the following provision, as identified in Specific Term No. 8, shall apply:
>
> i. Forfeiture of Earnest Money. That portion of the Earnest Money that does not exceed five percent (5%) of the Purchase Price shall be forfeited to the Seller as the sole and exclusive remedy to Seller for such failure.

It further provided that "If this transaction fails to close for any reason other than default by Seller, the non-refundable deposit shall remain the property of the Seller." (emphasis added). Both the Ebbelers and the Estate sought to enforce the REPSA to take advantage of these provisions; neither party sought rescission.

Under RAP 2.5(a), we will not consider arguments raised for the first time on appeal. LK Operating LLC v. Collection Grp. LLC, 181 Wn.2d 117, 126, 330

- 10 -

P.3d 190 (2014). Because the Ebbelers did not pursue rescission of the REPSA, the trial court did not abuse its discretion in denying this relief to them.

Breach of Contract

The Ebbelers next contend the trial court erred in finding that they, and not the Estate, failed to tender performance under the REPSA. They argue that the Estate breached a duty to provide the correct form of deed and to record that deed on May 29, 2019. They also maintain the Estate breached the obligation to provide marketable title by failing to remove the HWMS Trust's lien and to provide a temporary sewer connection from the District's system to the house before closing.

We reject each argument. First, the parties agreed that the closing agent, not the Estate, would prepare any necessary deed. It was not the Estate that failed to provide the appropriate form of deed at closing. Second, the evidence supports the finding that the Estate was ready, willing and able to execute a personal representative's deed in time for conveyance documents to be recorded on May 29, 2019, and the delay in executing the personal representative's deed did not cause this transaction to fail. Third, the evidence does not support the Ebbelers' contention that the Estate did not take steps needed to discharge the HWMS Trust lien. Finally, the Estate had no contractual obligation to provide a temporary sewer connection to the home before closing.

1. Duty to Provide and Record Personal Representative's Deed

The Ebbelers contend that the Estate was required to provide, execute, and record the appropriate deed and the Estate failed to do so.

Whether a party had a contractual duty to take an action at a particular time is a question of law. Badgett v. Security State Bank, 116 Wn.2d 563, 568, 807 P.2d 356 (1991). Whether a party breached a contractual duty is a question of fact. Frank Coluccio Constr. Co. v. King County, 136 Wn. App. 751, 762, 150 P.3d 1147 (2007).

Here, the REPSA did not require the Estate to prepare the personal representative's deed. The REPSA stated that the "[d]eed to convey interest shall be substantially as herein." The Estate attached an exemplar personal representative's deed to the REPSA. In their respective "Closing Agreement and Escrow Instructions," both the Ebbelers and the Estate agreed to delegate to the closing agent the responsibility of preparing and recording all necessary conveyance documents. These closing agreements explicitly stated that "[t]he closing agent is instructed to select, prepare, complete, correct, receive, hold, record and deliver documents as necessary to close the transaction." It was thus WFG's responsibility, and not that of the Estate, to prepare the correct form of deed, to make it available to Andrews to execute, and to record it once it had sufficient proceeds from the Ebbelers to close. The Estate had no contractual duty to prepare or record the deed.

2. Seller's Tender of Performance

The Ebbelers next argue that the Estate breached the duty to execute the deed before the King County Recorder's Office closed at 3:30 pm on the day of closing.

The trial court found:

> Defendant tendered his performance by executing, before a notary, a Personal Representative's Deed[.]  Any delay in executing the PR deed was not because Mr. Andrews was late to escrow on May 29, 2019, but rather because escrow and the Ebbelers had provided the incorrect deed, which needed to be fixed before he could sign.[3]

There is substantial evidence supporting these findings.

The Ebbelers do not challenge the finding that Andrews was delayed in signing the personal representative's deed until 3:51 p.m. because WFG mistakenly prepared the incorrect form of deed.  Leggett testified she erred in choosing a statutory warranty deed and in including that form deed in the packet she sent to the Ebbelers to approve.

While the Ebbelers contend Andrews acted in a dilatory manner in reviewing the closing documents, the trial court did not find this accusation to be credible. On May 24, Andrews sent an email to Leggett requesting to review the closing documents prepared by WFG.  This request was repeated by his attorney, Lisa Peterson, on May 29.  Both requests went unanswered.  One can infer from this evidence that had Leggett provided a draft of the deed to Andrews and Peterson when they asked her to do so, they would have discovered the error sooner.  The trial court was free to decide that the failure to discover WFG's error before the afternoon of May 29 did not constitute a breach of contract by the Estate.

The evidence also supports the trial court's finding that the delay in executing the deed did not cause this transaction to fail.  Andrews arrived at the WFG office ready to sign all documents at 2:17 p.m. on May 29.  He signed the

---

[3] The trial court identified these findings as conclusions of law.  Because performance is a question of fact, we review these conclusions of law as findings of fact.  See Willener, 107 Wn.2d at 394 (reviewing trial court's conclusion of law that parties did not perform as a finding of fact).

closing documents, save the deed, by 2:48 p.m. Leggett testified that the deadline for recording documents with the King County Recorder's Office is 3:30 p.m. The recording process, however, is done electronically. According to WFG's junior closer, Autumn Bray, it takes 5 to 10 minutes to process and record signed conveyance documents. Had WFG prepared the correct form of deed for the Ebbelers to approve and for Andrews to sign, he would have executed it no later than 3 p.m., and WFG would have had ample time to record the deed before the 3:30 p.m. recording cutoff.

Substantial evidence also supports the trial court's finding that it was the Ebbelers' failure to tender the full purchase price that caused this transaction to fail. The parties agree that the REPSA required concurrent performance by both the buyer and the seller. If a contract requires concurrent performance, the party claiming nonperformance of the other must establish, as a matter of fact, the party's own performance. Wallace Real Estate, 124 Wn.2d at 897. This the Ebbelers failed to do.

The Agreement required the Ebbelers to pay the purchase price "in cash at Closing." "Closing" was identified as "on or before" May 29, 2019. In finding of fact 90, the trial court found that "[t]he Ebbelers did not deposit the balance of the purchase price with WFG on or before May 29, 2019." The Ebbelers do not challenge this finding of fact on appeal.

In conclusion of law 98,[4] the court stated:

> The Ebbelers failed to show that they could or would have funded the transaction. The Ebbelers failed to provide sufficient evidence that they complied with or could have complied with their obligations.

---

[4] Due to a typographical error, the paragraph was numbered 98 rather than 8.

The simple fact is that they waived their financing contingencies and the money was not there on the day of closing. The Ebbelers' failure to perform caused the closing to fail.

Although the Ebbelers assign error to this conclusion, their failure to assign error to finding of fact 90 precludes them from challenging on appeal that they complied with their obligation to pay the purchase price at closing.

The Estate's real estate expert, Scott Osborne, testified that the Estate tendered performance when required to do so, but the Ebbelers' failure to deposit the purchase funds on the day of closing precluded the closing agent from recording any deed that day. Both Osborne and the Ebbelers' escrow expert, Jordan Hecker, agreed that an escrow agent will not record a deed before the purchase money has been deposited with them.

The experts' testimony is consistent with the REPSA and the closing instructions. Under the REPSA, "'[c]losing' means the date on which all documents are recorded <u>and the sale proceeds are available to Seller</u>." (emphasis added). The Closing Agreement stated:

> The closing agent is instructed to perform its customary closing duties under these instructions, to deliver and record documents according to these instructions, and to disburse the funds according to the settlement statement . . . when the closing agent has the documents required to close the transaction in its possession <u>and has</u> . . :
>
> 1. Sale proceeds for the seller's account to be disbursed according to the settlement statement.
> 2. Loan proceeds for the buyer's account in the amount of $1,610,000.00 to be disbursed according to the settlement statement.

The Ebbelers do not dispute that WFG lacked sufficient sale proceeds to close this transaction. Because WFG had no sale proceeds to disburse to the Estate, it

- 15 -

follows that WFG would have had no authority to record any deed had Andrews signed it prior to 3:30 p.m. Substantial evidence supports the trial court's findings that the Ebbelers, and not Andrews, caused this transaction to fail.

### 3. HWMS Trust's Lien

The Ebbelers next contend the Estate breached the REPSA by failing to resolve the HWMS Trust's lien on the property. The evidence does not support this argument.

The REPSA required the Estate to transfer "marketable title" to the Ebbelers at closing. Paragraph "d" of the General Terms provided:

> Unless otherwise specified in this Agreement, title to the Property shall be marketable at Closing. . . . Monetary encumbrances or liens not assumed by Buyer, shall be paid or discharged by Seller on or before Closing.

At the time of the REPSA, the sole mortgage on the property was held by the HWMS Trust, a trust created by Sidney Andrews' grandmother. This trust loaned funds to Alison to cover her living expenses and secured the loan with a deed of trust on the property. On Alison's death, the Trust's advances exceeded $4 million.

WFG asked the Estate to provide a payoff amount from the HWMS Trust to ensure that its lien was released at closing. Initially, Andrews identified the payoff amount as the $4 million balance on the loan. Because this total exceeded the purchase price, WFG's Dani Leggett informed Andrews that the Estate would need to bring cash to closing to pay off the HMWS debt. Andrews testified that, because it "seemed ridiculous" to take money out of "[one] pocket" to pay off a loan the proceeds of which would simply be returned to the "[other] pocket" at closing, he and his siblings, the co-trustees, agreed to reduce the HMWS loan payoff to equal

the net of the seller's proceeds from the sale. At WFG's request, Andrews provided the original promissory note and deed of trust and a revised loan payoff amount to ensure that the Trust's lien would be released at closing.

WFG's settlement statement identified this payoff to the Trust. It also included a $250 "reconveyance fee." Had the Ebbelers tendered the purchase funds, as they were required by the REPSA to do, WFG would have been in the position to disburse $1,995,491.39 to the HMWA Trust to pay off the loan and file the documentation needed to release its lien on the property. There is no evidence to suggest that had the Ebbelers tendered the purchase price, and the loan to the Trust was paid off, that its lien would have continued to encumber the property.

4. Temporary Sewer Connection

Finally, the Ebbelers contend the Estate breached the REPSA by failing to install a temporary sewer connection before closing. We reject this contention, however, because the Estate had no obligation to establish this connection once the District agreed to approve the sale without this connection in place.

The REPSA indicated the property was not connected to a public sewer main. Andrews testified that before the parties finalized the REPSA, he made it clear that the Estate was selling the home without a sewer connection in place. Under the REPSA, the Ebbelers had 25 days to inspect the property, including the sewer system, and to terminate the REPSA if they were not satisfied with the property's condition. They had the ability to ask the Estate to make repairs, but the parties had to negotiate any such request, with the Estate retaining the right to reject any repairs the Ebbelers requested. The Estate had no obligation to agree

- 17 -

to make any repairs to the sewer system and, if the Ebbelers were dissatisfied with the Estate's refusal, they had time to terminate the REPSA within the inspection period.

Although the Ebbelers attempted to negotiate changes to the REPSA to reflect the lack of a sewer connection, the parties did not reach agreement on any repairs. We conclude the Estate had no contractual duty to provide a temporary sewer connection before closing.

The Ebbelers alternatively contend that the Estate failed to satisfy a lien that the District had placed against the property for its noncompliant sewer system. The evidence does not support this contention. Paul Konrady, the District's General Manager, testified at trial that the holdback was intended to cover the cost of the District providing any temporary sanitary sewer connection. He further testified that the District was willing to consent to the sale when the Estate agreed to this holdback amount. At closing, Andrews executed a "Seller's Sewer Declaration" in which he confirmed that the Highlands had the right to request the holdback of funds from the sale to cover the expense of sewer repairs.

The trial court entered an unchallenged finding of fact that the Ebbelers and the District both agreed that the sale could go through with the $150,000 holdback. There is no evidence that the District required that the Estate install a temporary sewer connection before closing and no evidence that the District had any lien against the property.

Because there is substantial evidence supporting the trial court's findings that the Ebbelers breached the REPSA by failing to tender the sale proceeds on

or before May 29, and that the Estate tendered full performance when required to do so, we affirm the dismissal of the Ebbelers' breach of contract claim.

### Duty of Good Faith and Fair Dealing

The Ebbelers alternatively argue that the Estate breached a duty of good faith and fair dealing by refusing to provide a copy of the signed deed to WaFed before WaFed wired funds to escrow and by failing to arrive at WFG's offices until after WaFed's 2 p.m. wire cutoff. They contend that these actions thwarted their ability to pay the purchase price at closing and violated an implied duty of good faith and fair dealing.

There is an implied duty of good faith and fair dealing in every contract. Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance. Id. The duty of good faith, however, does not extend to obligate a party to accept a material change in the terms of its contract. Id. Nor does it inject any substantive terms into the parties' contract. Id. Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement. Id. Thus, the duty arises only in connection with terms agreed to by the parties. Id. A party does not breach the duty of good faith when it "simply stands on its rights to require performance of a contract according to its terms." Id. at 570.

1. Estate's Refusal to Provide Executed Deed to Buyer's Lender

The Ebbelers first maintain that the Estate breached a duty of good faith and fair dealing by refusing to allow WFG to transmit a copy of the executed and

notarized deed to WaFed. We reject this argument because there was no provision in the REPSA requiring the Estate to provide a copy of the executed deed to the Ebbelers' lender as a precondition to the Ebbelers tendering the purchase price.

In their reply brief, the Ebbelers argue that Regulation Z of the Truth in Lending Act[5] "unambiguously required the Estate to fully disclose to WaFd its REPSA settlement statement where, as here, the settlement statement of the buyer and seller differ." We can find no such requirement in any of the federal regulations cited by the Ebbelers.[6] Because the Estate had no contractual obligation to provide WaFed with a copy of its executed deed, it did not breach any duty of good faith and fair dealing to refuse to do so.

More importantly, the trial court found that the Ebbelers failed to establish—as a factual matter—that WaFed refused to wire funds into escrow because the Estate would not allow it to review its executed deed. It found that both the Closing Agreement and the WaFed loan documents were silent on any precondition that required receiving a signed, notarized copy of an acknowledged deed before the bank would fund the loan. Although the Ebbelers assign error to this finding, we can find nothing in these documents that references any such requirement.

---

[5] Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; Regulation Z, 12 C.F.R. § 1026.
[6] The Ebbelers cited to 12 C.F.R. §1026.19(f)(i), 12 C.F.R. §1026.19(f)(iv), and 12 C.F.R. §1026.38. The first two code provisions do not exist. If the Ebbelers intended to refer to 12 C.F.R. §1026.19(f)(1)(i), that provision requires a lender to provide its borrower with certain disclosures reflecting the actual terms of the loan. 12 C.F.R. §1026.19(f)(1)(iv) relates to the borrower's waiver of a waiting period in the event of a financial emergency. Neither provision imposes a duty on a seller to disclose anything to a buyer's lender in a real estate transaction. Finally, the Ebbelers cite to 12 C.F.R. §1026.38, but this provision, like §1026.19, relates only to lender disclosures to borrowers. It does not require a seller to provide a buyer's lender with a copy of an executed deed as a precondition to the lender being allowed to wire loan funds into an escrow account.

There was some evidence to support the Ebbelers' contention that WaFed would not authorize the transaction <u>to close</u> without having the opportunity to review the executed deed. Leggett testified that "[m]ost lenders require a copy of the . . . signed deed by the seller." Autumn Bray, another WFG agent, testified that lenders require a copy of seller documents before "fund[ing] the file," and indicated that lenders often deposit funds in escrow until they have a chance to see the signed documents, including the deed. When asked if WaFed would "fund a loan" without seeing a copy of the signed deed from the seller, WaFed loan manager Barbara Otero testified "To my knowledge, I don't think so. But I could be wrong." Otero stated that the decision whether to fund a loan is made by WaFed's closing department and she did not have a part in that process.

But there is a difference between wiring funds into escrow and authorizing the disbursement of loan proceeds. The Ebbelers' evidence arguably establishes that WaFed would not authorize WFG to pay loan proceeds to the Estate without first seeing its executed deed; it does not prove that WaFed would not wire funds into escrow until it had done so. Both Leggett and Bray testified that lenders often pre-wire the funds to escrow with instructions not to release them until the signed deed is approved.

No member of the WaFed closing department testified that WaFed refused to wire loan funds into escrow until it received and reviewed a copy of an executed seller's deed. Nor is there any evidence in any direct communication from WaFed to WFG, to the Ebbelers, or to Andrews, stating that it needed to see the seller's signed deed before it could wire the funds into escrow.

Even more compelling was the fact that no one from WaFed testified that Andrews caused the bank to withhold funds on May 29. The trial court found that "WaFed would not fund a loan for over two million dollars without accurate Loan Documents." The evidence at trial established that the Ebbelers did not complete the loan documents to WaFed's satisfaction. Otero identified a list of corrections that the bank needed the Ebbelers to make to the closing documents before WaFed would wire the loan funds. Otero testified that the loan closing package errors needed to be corrected and WaFed would not fund the loan until they had confirmed that the loan package was complete and the items corrected. The Ebbelers failed to present any evidence that they corrected these errors and WaFed approved the final closing documents that day.

The Estate had no contractual duty to transmit its executed deed to the Ebbelers' lender as a condition of funding the sale. And the evidence supports the trial court's finding that WaFed did not fund the Ebbelers' loan because their loan paperwork was incomplete, and not because of anything Andrews did or did not do. The trial court did not err in concluding that the Estate did not breach a duty of good faith and fair dealing.

2. <u>Duty to Execute Conveyance Documents Before 2 p.m. on Closing Day</u>

The Ebbelers next argue that the Estate breached an implied duty to execute the seller's closing documents before 2 p.m., the deadline for any wire transfers. They maintain that this wire cutoff time constitutes a "usage of trade" term that supplemented or qualified Andrews' performance obligations under the REPSA:

> WaFd could not wire the loan proceeds because bank wire transfers ran through the Federal Reserve in New York and it closed after 2:00 p.m. Seattle time.
>
> Such usages of trade as the Federal Reserve's wire transfer cut off become part of a contract's proper interpretation, even if the contract term was not ambiguous on its face.

By waiting to execute documents until after 2 p.m., the Ebbelers contend, Andrews effectively prevented WaFed from wiring the loan proceeds into escrow on the day of closing.

We reject this argument for two reasons. First, the existence of any usage of trade is a question of fact and the Ebbelers failed to prove any such usage of trade existed or that Andrews was aware of any such implied term. Second, the purported implied term conflicts with the explicit language of the REPSA.

Washington courts have recognized that trade usage may be relevant to interpreting a contract and determining a contract's terms. Puget Sound Fin., L.L.C. v. Unisearch, Inc., 146 Wn.2d 428, 434-35, 47 P.3d 940 (2002); Bremerton Concrete Prods. Co. v. Miller, 49 Wn. App. 806, 809-10, 745 P.2d 1338 (1987). The Restatement (Second) of Contracts (Am. Law Inst. 1979) § 222 defines "usage of trade":

> A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement. . . .
>
> . . . .
>
> Unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged or a usage of trade of which they know or have reason to know gives meaning to or supplements or qualifies their agreement.

But Section 222 also provides that "[t]he existence and scope of a usage of trade are to be determined as questions of fact." And under the Restatement (Second) of Contracts § 221 (Am. Law Inst. 1979):

> An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage (emphasis added).

To prevail under these provisions of the Restatement, the Ebbelers had to prove (1) the existence of a trade usage requiring a seller to sign all of the seller's documents no later than 2 p.m. on the day of closing to facilitate a wire transfer from the buyer's lender, (2) that this requirement is regularly observed by lenders, sellers, buyers and closing agents in residential real estate transactions in Washington; (3) that both the Ebbelers and Andrews knew of or had reason to know of this usage of trade; and (4) neither the Ebbelers nor Andrews knew or had reason to know that the other party had an intention inconsistent with this usage.

The Ebbelers simply failed to meet this burden of proof. The Ebbelers' expert, Jordan Heckler, testified that "if a party is using a lender to do a transaction," then the cutoff for a wire transfer of money is 2 p.m. and that this wire cutoff time was "widely known" in his industry. But this evidence related to the lender's ability to transmit funds to escrow on any particular day. It did not relate to whether the seller has a contractual obligation to sign closing documents before 2 p.m. on the day of closing. The court explicitly asked Heckler why, if this deadline was so well-established, parties did not make it a part of their agreements:

> Court: . . . [W]hy aren't those timeframes memorialized or put in standard closing instructions if they're so well known and

- 24 -

immutable? And why instead [do] PSAs and closing instructions have 9 p.m. as sort of the end of day for -- in terms of considering when a day ends for purposes of contracts?

[Heckler]: . . . With respect to escrow, escrow, again, is not really in a position to [write] the part[ies'] agreement. All they can do is request cooperation. . . . [B]ecause I've been involved in these types of things so I get to write my own instructions, we put in there, please understand despite your closing date is X and people consider close of business 5 p.m., that you will need to come in well before that to ensure the time needed for your closing. We don't set an absolute cutoff, we don't identify why it's got to happen, but we definitely give people a head's up that it's got to happen (emphasis added).

Heckler conceded that the legal community had not modified the NWMLS form contract to incorporate a 2 p.m. signing deadline.

Moreover, the trial court found the evidence of any particular wire cutoff time was less than clear. It referenced emails from Leggett in which she asked Mazzarro to confirm WaFed's cutoff time and told Andrews at one point that she needed him to sign the closing documents no later than 3 p.m. Otero from WaFed indicated on May 30 that the deadline was actually 1 p.m. Given this evidence, the trial court concluded that the Ebbelers simply failed to prove the existence of any specific trade usage.

Moreover, usage of trade does not displace explicit terms in any contract. Section 203 of the Restatement (Second) of Contracts (Am. Law Inst. 1979) provides that in interpreting agreements, "express terms are given greater weight" than usage of trade. Here, the trial court found that the REPSA contained an express term addressing the time for performance on the day of closing:

13. In addition, the parties' Northwest Multiple Listing Service ("NWMLS") form contract also contains a provision that when

performance is due on a certain date, it must be performed no later than 9:00 p.m. the final day:

> Computation of Time: Unless otherwise specified in this Agreement, any period of time measured in days and stated in this Agreement shall start on the day following the event commencing the period and shall expire at 9:00 p.m. of the last calendar day of the specified period of time. . . . If the parties agree that an event will occur on a specific calendar date, the event shall occur on that date, except for the Closing Date, which, if it falls on a Saturday, Sunday, legal holiday . . . , or day when the county recording office is closed, shall occur on the next day that is not a Saturday, Sunday, legal holiday, or day when the county recording office is closed.

Under this paragraph, the provision that Closing shall occur "on or before May 29, 2019" means that the time for performance ends at 9:00 p.m. on the Closing Date.

The Ebbelers challenge this finding, arguing that the 9 p.m. performance deadline applies only to deadlines measured in multiple days, and does not apply to the time of performance on the day of closing.

But when more than one interpretation of a contract term is reasonable, which meaning reflects the parties' intent is a question of fact. Healy v. Seattle Rugby, LLC, 15 Wn. App. 2d 539, 545, 476 P.3d 583 (2020). Andrews testified he understood the REPSA required that closing occur by 9 p.m. on May 29. He further testified that, in his experience, he had never been asked to sign closing documents earlier than at the end of the escrow office's business day. Andrews' real estate expert, Scott Osborne, testified that it is not unusual for parties to a real estate transaction to come into the escrow agent's office to sign documents in the afternoon on the day of closing. Based on this evidence, the trial court had a factual basis for adopting Andrews' interpretation of the REPSA and for rejecting

the Ebbelers' argument that usage of trade is needed to fill in a missing deadline in the parties' agreement.

The trial court's findings that Andrews did not thwart the Ebbelers' performance and did not violate his duty of good faith and fair dealing are supported by the evidence at trial. The trial court did not err in dismissing the Ebbelers' claim.

Attorney Fee Award

Because we affirm the judgment for the Estate, we also conclude that the trial court did not err in awarding attorney fees to the Estate. The REPSA provided that "if Buyer or Seller institutes suit against the other concerning this Agreement the prevailing party is entitled to reasonable attorneys' fees and expenses." The Estate prevailed against the Ebbelers at trial and was entitled to an award of fees.

The Ebbelers argue that the $264,372 fee award was unreasonable and the trial court abused its discretion in calculating this fee. We disagree and conclude there are reasonable bases in the record for the award.

This court reviews the reasonableness of the attorney fee award for abuse of discretion. Bangerter v. Hat Island Cmty. Ass'n, 14 Wn. App. 2d 718, 744, 472 P.3d 998 (2020), review granted, 196 Wn.2d 1037 (2021). Washington courts utilize the lodestar method for calculating a reasonable attorney fee under a contractual fee-shifting provision. Cuong Van Pham v. City of Seattle, 159 Wn.2d 527, 538 151 P.3d 976 (2007). To calculate a lodestar amount, a court multiplies the number of hours reasonably expended by the reasonable hourly rate. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983). The

hours reasonably expended must be spent on claims having a "common core of facts and related legal theories." Martinez v. City of Tacoma, 81 Wn. App. 228, 242-43, 914 P.2d 86 (1996). The court should discount hours spent on unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time. Bowers, 100 Wn. 2d at 597. A court abuses its discretion in awarding fees for certain work only if the decision is manifestly unreasonable or based on untenable grounds. Southwest Suburban Sewer Dist. v. Fish, 17 Wn. App. 2d 833, 838, 488 P.3d 839 (2021).

1. Unsuccessful Motions

The Ebbelers first challenge the trial court's inclusion of $80,000 in fees for time the Estate's attorneys spent on unsuccessful motions, including a motion to cancel the Ebbelers' lis pendens, a motion to exclude witnesses, motions in limine, and a motion for summary judgment.

The trial court did not abuse its discretion here. First, the Estate explicitly excluded from its fee request all time relating to the motion to cancel the lis pendens, and the trial court excluded these fees from the final award.

Second, as to the motion to exclude witnesses, the Estate argued below that the motion was a necessary alternative to its motion for a trial continuance. According to the Estate, the Ebbelers agreed to continue the trial date only because the Estate filed these motions. The record indicates a reasonable basis for the trial court to conclude that the legal work performed on the motion to exclude witnesses was necessary for the Estate to prevail on its request for a trial continuance.

Third, the Estate included the fees associated with its summary judgment motion because the motion "at a minimum narrowed the issues and nearly resolved the case." The trial court's order on summary judgment did narrow the issues for trial by identifying several undisputed facts,[7] including the fact that "buyer did not post sufficient funds for the purchase of the Cherry Loop Lane residence." In this sense, the trial court could have concluded that the Estate's summary judgment motion was not actually unsuccessful. There was a tenable basis for including these fees in the award to the Estate.

Fourth, as to the Estate's motions in limine, it moved to exclude testimony of the Ebbelers' expert, Jordan Hecker, evidence of any alleged WaFed instructions requiring Andrews to provide a signed deed before disbursing funds, evidence from a "crashed" computer that the Ebbelers produced in an untimely manner, and any evidence to dispute what were undisputed factual findings made at the summary judgment stage.

The court denied the motion to exclude testimony from Hecker and refused to limit the Ebbelers' ability to present evidence that might contradict the court's summary judgment findings. It reserved ruling on the motion to exclude evidence of the lender's instructions about the deed, but the Ebbelers did not subsequently offer this evidence. As to the Ebbelers' computer production, the court found that the parties had "essentially reached agreement on the destroyed documents issue"

---

[7] The Ebbelers contend that these findings of fact were superfluous and should be ignored by this court on appeal, citing Hamilton v. Huggins, 70 Wn. App. 842, 848, 855 P.2d 1216 (1993). But CR 56(d) explicitly permits a trial court to "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." Unlike the trial court in Hamilton, the trial court complied with this rule.

with the Ebbelers agreeing not to elicit testimony about documents not in the record.

Based on this record, the Estate prevailed in part on some of its evidentiary motions. The Estate argued that "while certain motions in limine were unsuccessful, others were pending before the Court throughout the duration of trial." It insisted that the fees incurred in preparing these evidentiary motions were necessarily incurred in defending against the Ebbelers' claims. The trial court appears to have agreed with the Estate as it explicitly found that the work performed for "[p]repar[ing] a motion in limine on trial witnesses and evidentiary issues" was reasonable. The Ebbelers cite no authority for the proposition that a court abuses its discretion in awarding attorney fees for work performed on a partially successful motion in limine when the court ultimately concludes that the evidentiary arguments proved helpful to it at trial.

2. Hourly Rates

The Ebbelers also challenge the reasonableness of the hourly rate charged by the Estate's attorneys and paralegals. They specifically contend that the hourly rates charged by the Estate's law firm were excessive when compared to average rates in the King County area.

Our Supreme Court has stated that a legal professional's established rate for billing clients is likely a reasonable rate for lodestar purposes. Bowers, 100 Wn.2d at 597. But the court may evaluate the fees customarily charged in the locality for similar legal services in determining the proper rate. Mahler v. Szucs, 135 Wn.2d 398, 433 n.20, 957 P.2d 632 (1998). A trial court may also consider

"the level of skill required by the litigation, time limitations imposed on the litigation, the amount of the potential recovery, the attorney's reputation, and the undesirability of the case." Bowers, 100 Wn.2d at 597. If the court finds the hourly rate is "too high" or excessive, the court may reduce the hourly charge. Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 65, 738 P.2d 665 (1987).

The trial court found that the awarded rates were "objectively reasonable in light of the experience of counsel representing Defendant in this locale." This finding is supported by evidence in the record. Brian Fanning, the Director of Practice Economics at Davis Wright Tremaine, testified that the billing rates for the law firm are set based on annual survey data compiled by national accounting firms. The rates that this firm charged the Estate were generally at the midpoint range of rates of 21 other large law firms with offices in Seattle and are reflective of rates that are localized to the Puget Sound area legal market. Attorney Rhys Farren, who tried this case with an associate, Rebecca Shelton, testified that his hourly rate had been approved by several local courts in the Seattle area. The trial court thus had a tenable basis for concluding that the hourly rates charged for this case were not excessive.

Moreover, the record demonstrates the trial court played an active role in assessing the reasonableness of the overall fee award. Acknowledging the relative lack of litigation experience of associate Shelton, the court reduced her total charges by half. The court similarly reduced the fees awarded for work performed by paralegals, recognizing that some of that work was administrative in nature. The trial court did not abuse its discretion in its fee award to the Estate.

We award attorney fees to the Estate on appeal under RAP 18.1 contingent upon the Estate's compliance with RAP 18.1(d).

Affirmed.

Andrus, A.C.J.

WE CONCUR: